JOEL R., a Minor, by His Aunt and Next Friend, Ericka Salazar, Plaintiff-Appellee, v. THE BOARD OF EDUCATION OF MANNHEIM SCHOOL DISTRICT 83, Cook County, Illinois, *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 1—96—4411

Opinion filed September 30, 1997.

J. Todd Faulkner, Lisa A. Lopatka, and Erika Dillon, all of Chicago, for appellants.

Patricia Mendoza and Rosa Abreu, both of Chicago, for appellee.

JUSTICE TULLY delivered the opinion of the court:

Plaintiff, Joel R. (hereinafter Joel), a minor, by his aunt and next friend, Ericka Salazar (hereinafter Ericka), filed this action in the circuit court of Cook County seeking an injunction prohibiting defendants, the Board of Education of Mannheim School District 83, Cook County, Illinois, John F. Ludolph, in his official capacity as superintendent of Mannheim School District 83, Dominick Cupuro, in his official capacity as president of the board of education of Mannheim School District 83, and Marilyn Finesilver, in her official capacity as principal of Mannheim Middle School, from barring Joel from enrolling in and attending classes at Mannheim Middle School on a tuition-free basis. On November 15, 1996, the circuit court entered a preliminary injunction permitting Joel's tuition-free enrollment at Mannheim Middle School. On November 27, 1996, the circuit court entered an order converting the preliminary injunction into a permanent injunction. It is from the latter order that defendants now appeal to this court pursuant to section 6 of article VI of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Supreme Court Rule 301 (155 Ill. 2d R. 301).

For the reasons which follow, we affirm.

## FACTUAL BACKGROUND

Joel is a United States citizen who was born in El Paso, Texas. See U.S. Const., amend. XIV ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside"). On July 27, 1996, 13-year-old Joel arrived in Melrose Park, Illinois, from Mexico to live on a full-time basis with his maternal aunt, Ericka. Ericka has assumed the role of a parent to Joel and provides for all of his needs.

On August 20, 1996, Ericka went to Mannheim Middle School, a public school located in Mannheim School District 83. Ericka spoke to Angie Latragna, a bilingual teacher at the school. After Ericka presented Joel's birth certificate, Latragna asked Ericka if she had anything that would prove she had legal custody of Joel. When Ericka responded that she did not, Latragna told her that, pursuant to District 83's "Registration Checklist," she needed legal custody of her nephew. Latragna then instructed Ericka to obtain a notarized statement from Joel's parents granting Ericka custody of their son and authorizing her to represent Joel before District 83.

Ericka followed Latragna's instructions and obtained a notarized document executed by Joel's parents before a judge in Mexico which granted Ericka custody over Joel.

On September 9, 1996, Ericka returned to Mannheim Middle School and attempted to enroll Joel. However, Ericka was informed by a secretary that the Mexican document was not sufficient to enroll Joel because it did not establish, through an American court, that Ericka was Joel's legal guardian. Ericka next spoke to Marilyn Finesilver, the school principal. Finesilver informed Ericka that she could not admit Joel because anyone could obtain a notarized letter and that Ericka needed to obtain legal guardianship in an American court. In response, Ericka explained that Joel's parents were in Mexico and that her sister, Joel's mother, was a Mexican citizen with no permission to enter or reside in the United States. Finesilver responded that if Joel's mother was not a legal resident of the United States, he could not be admitted to Mannheim Middle School. Finesilver then queried Ericka as to why Ericka was trying to register Joel in school. Ericka responded, "Because I live in the district and he needs to go to school." Finesilver then stated that she could not enroll Joel in the school and Ericka left the building.

After Ericka left, Finesilver telephoned John Ludolph, the district superintendent, explained the series of events and asked if she had made a proper residency determination. Ludolph told Finesilver that she had made a proper residency determination. On September 12,

1996, Ludolph spoke to Ericka by telephone and told her that he had made a determination in accord with that of Finesilver. Neither Ludolph nor Finesilver informed Ericka of her right to appeal their decision to the district's board of education, as was required by the district's residency policy.

On September 23, 1996, Ericka, along with a congressman working on her behalf, met with Ludolph and an attorney for the district, Todd Faulkner. At the meeting, Ludolph and Faulkner explained that they were denying Joel tuition-free admission on the basis of their reading of *Turner v. Board of Education, North Chicago Community High School District 123*, 54 Ill. 2d 68 (1973).

On October 11, 1996, another conference was held concerning Joel's residency. Ericka, Ericka's attorney, Joel, Finesilver, Ludolph, and Faulkner, among others, were present at the meeting. During the meeting, Ericka and Joel put forth evidence of Joel's living conditions in Mexico and the circumstances surrounding Joel's return to the United States. However, Ludolph deemed these reasons not sufficiently credible to overcome his initial determination that Joel's sole purpose for residing in the district was to attend the district's school for free. In a letter dated October 14, 1996, Ludolph set forth his decision in writing.

Upon receiving Ludolph's letter, Ericka learned for the first time that she had the right to appeal Ludolph's residency determination— almost two months after Finesilver and Ludolph determined that Joel was not a district resident. On October 22, 1996, Ericka and Joel appealed Ludolph's decision to the school board.

Prior to this time, the Illinois State Board of Education had been investigating the matter. After concluding its investigation, on October 22, 1996, the state board sent a letter to Ludolph requesting that District 83 enroll Joel on a tuition-free basis. Ludolph did not comply.

On October 24, 1996, a hearing was held before the District 83 school board to review Ludolph's determination of Joel's residency. Once again, all the evidence concerning Joel was put forth. On October 25, 1996, the board affirmed Ludolph's decision.

On October 28, 1996, Ericka filed a complaint for injunctive relief with the circuit court requesting an order directing District 83 to enroll Joel in school as a resident on a tuition-free basis. On October 29, 1996, a 10-day temporary restraining order was entered allowing Joel to immediately enroll in Mannheim Middle School. A full evidentiary hearing was held before the circuit court on November 7 and 8, 1996. After hearing all the evidence, the circuit court issued a written opinion preliminarily enjoining District 83 and ordering it to enroll Joel on a tuition-free basis.

The circuit court explained its decision was based primarily upon its finding credible Ericka and Joel's assertion that Joel's purpose for living in Melrose Park was not solely for educational purposes. The circuit court further found that Ericka was never afforded any meaningful opportunity to articulate any and all reasons for Joel's presence in her home in spite of her attempting to do so on numerous occasions. Finally, the circuit court found that once the decision was made by defendants not to admit Joel to Mannheim Middle School, they became intractable as to their position.

On November 27, 1996, the circuit court converted its preliminary injunction into a final order for permanent injunction.

The instant appeal followed.

## ISSUE PRESENTED FOR REVIEW

Did the circuit court err in finding Joel a *bona fide* resident of District 83 for school purposes?

## OPINION

■ The 1970 Illinois Constitution places an obligation upon the state to "provide for an efficient system of high quality public educational institutions and services" (Ill. Const. 1970, art. X, § 1) and grants a right to a tuition-free education at the elementary and secondary levels. *Lewis E. v. Spagnolo*, 287 Ill. App. 3d 822 (1997). To that end the Illinois School Code provides that local school boards must establish free schools through the secondary level to accommodate residents of their districts between the ages of 6 and 21 years. 105 ILCS 5/10—20.12a (West 1994). A child presumptively resides in the school district where his parents reside; however, for school purposes, this presumption may be rebutted by circumstances showing a different residence. *Kraut v. Rachford*, 51 Ill. App. 3d 206, 212 (1977). The child's residence in a district other than that in which his parents reside is sufficient to entitle him to attend school tuition-free in the district in which he resides so long as such residence was not established solely to enjoy the benefits of free schooling. *Turner v. Board of Education, North Chicago Community High School District 123*, 54 Ill. 2d 68 (1973); *Ashley v. Board of Education*, 275 Ill. 274 (1916). Among the panoply of factors taken into consideration in making this determination are the following: the permanency of the child's residence; the extent to which the child's parents still exercise care, custody and control over the child; and the presence of noneducational reasons for the child's residence apart from his parents. *Israel S. v. Board of Education of Oak Park & River Forest High School District 200*, 235 Ill. App. 3d 652 (1992); *Kraut*, 51 Ill. App. 3d at 212-13.

■ Before turning to the issue of the propriety of the circuit court's ruling in this case, we must first examine what the proper standard of appellate review is in this case, an issue both sides to this controversy have briefed. In Illinois, the appropriate standard of review, or amount of deference this court gives to a decision of a trial court, depends upon two factors: (1) the type of case, *e.g.*, civil or criminal; and (2) the type of issue being reviewed, *e.g.*, fact or law.[1] T. O'Neill & S. Brody, *Taking Standards of Appellate Review Seriously: A Proposal to Amend Rule 341*, 83 Ill. B.J. 512, 513 (1995), citing M. Davis, *A Basic Guide to Standards of Judicial Review*, 33 S.D. L. Rev. 469, 470-71 (1988). The instant civil case involves a question of both law and fact. In other words, this case involves a "mixed question." See generally M. Louis, *Allocating Adjudicative Decision Making Authority Between the Trial and Appellate Levels: A Unified View of the Scope of Review, the Judge/Jury Question, and Procedural Discretion*, 64 N.C. L. Rev. 993 (1986). The United States Supreme Court has defined mixed questions as those in which "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant legal] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19, 72 L. Ed. 2d 66, 80 n.19, 102 S. Ct. 1781, 1790 n.19 (1982).

■ The review of a mixed question of law and fact necessitates three steps be taken by the appellate court. The first step in this process is the establishment of basic, primary or historical facts: facts in the sense of a recital of external events and the credibility of their narrators. The second step is the selection of the applicable legal rule. The third step—and the most troublesome for purposes of the standard of review—is the application of the law to fact or, in other words, the determination of whether the rule as applied to the established facts has been violated. *United States v. McConney*, 728 F.2d 1195, 1200 (9th Cir. 1984) (*en banc*).

■ The appropriate standards of review for the first two of the

---

[1]In the federal system a third factor is present, the type of fact finder, *e.g.*, judge or jury. E. Lee, *Principled Decision Making and the Proper Role of Federal Appellate Courts: The Mixed Questions Conflict*, 64 S. Cal. L. Rev. 235 (1991). The effect of this third factor on the standard of review is to afford greater deference to a jury's finding of fact than that of a judge. In Illinois, however, this distinction is meaningless as the findings of fact by a jury and the findings of fact by the circuit court in a nonjury case are judged by the same standard of review. *In re Marriage of Lima*, 265 Ill. App. 3d 753 (1994).

circuit court's determinations—its establishment of historical facts and its selection of the applicable law—have long been settled. Questions of fact, whether determined by a jury or by the circuit court in a nonjury case, are reviewed under the deferential, manifest weight of the evidence standard. *Usselmann v. Jansen*, 257 Ill. App. 3d 978, 981 (1994). Questions of law are reviewed under the nondeferential, *de novo* standard. *Roubik v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 285 Ill. App. 3d 217, 219 (1996). These established rules reflect the policy concerns that are the basis of standard of review jurisprudence generally.

■ A finding of fact or verdict is against the manifest weight of the evidence where, upon review of all the evidence in the light most favorable to the prevailing party, an opposite conclusion is clearly apparent or the fact finder's finding is palpably erroneous and wholly unwarranted, is clearly the result of passion or prejudice, or appears to be arbitrary and unsubstantiated by the evidence. *Usselmann*, 257 Ill. App. 3d at 981. This standard serves two policy objectives. First, by assigning primary responsibility for resolving factual disputes to the circuit court, a court in a superior position to evaluate and weigh the evidence, the risk of judicial error is minimized. This superior position comes simply from the fact that the circuit court, unlike a court of review, directly observes the demeanor of witnesses while testifying, judges their credibility, determines the weight such testimony should receive, and resolves conflicts where the evidence is contradictory. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172 (1989). Second, as the reviewing court need only determine, under the manifest weight of the evidence standard, whether the circuit court's decision was a reasonable one, it is relieved of the burden of a full-scale independent review and evaluation of the evidence. Consequently, valuable appellate resources are conserved for those issues that reviewing courts are best situated to decide. *McConney*, 728 F.2d at 1201.

■ The *de novo* standard of review for questions of law, however, is dictated by still another concern. The United States Court of Appeals for the Ninth Circuit explained the policy concerns that underlie *de novo* review as follows:

> "Under the doctrine of stare decisis, appellate rulings of law become controlling precedent and, consequently, affect the rights of future litigants. Rulings on factual issues, on the other hand, are generally of concern only to the immediate litigants. From the standpoint of sound judicial administration, therefore, it makes sense to concentrate appellate resources on ensuring the correctness of determinations of law." *McConney*, 728 F.2d at 1201.

That said, we will first examine the propriety of the circuit court's factual findings. As the parties are in agreement that *Turner* and its progeny, discussed *supra*, are controlling of this case, we will then direct our review to the question of whether the circuit court correctly applied the *Turner* doctrine to the facts.

■ We now turn to the question of whether the circuit court's factual finding "that the purpose of Joel's move to live with his aunt was not solely to attend school" is against the manifest weight of the evidence. We find the circuit court's determination of fact not to be against the manifest weight of the evidence.

Prior to its rendering of a decision, the circuit court held a full evidentiary hearing on the matter. At that hearing the circuit court heard ample evidence bolstering its conclusion that "[e]conomic, social, as well as educational reasons were involved in the decision for Joel R. to move [in] with his aunt." For example, lengthy testimony was presented about the economic and social hardships Joel faced living in Mexico.

Joel's parents are poor farmers in the small rural community of El Encino. The town has no paved roads, nor does it have a hospital or physician. The living conditions for Joel's family are difficult: they have no running water, no 24-hour electricity, and no heat for their home unless they cut firewood. Joel was required to help plant and harvest his family's crops, sometimes working for over 24 hours at a time. During the harvest, Joel slept in the fields and often missed school. In spite of these efforts, if there was a poor crop, Joel's family would be unable to make enough money to feed themselves. Thus, when Ericka expressed her willingness to raise Joel along with her two sons in the United States, Joel's parents, despite their desire to have their son with them, agreed that the boy's interests would be best served by his living with his aunt and permitted him to leave. There was never any discussion between Ericka and Joel's parents regarding the length of time Joel would remain in Ericka's custody or provision of financial assistance to Ericka for the expense of another child. Ericka has assumed the role of a parent to Joel and has met all of his living expenses.

The circuit court also heard the testimony of various school officials that Ericka initially indicated that Joel's sole purpose for residing in the Mannheim School District was to go to school, as well as Ericka's denial of such allegations.

After a careful review of the record on appeal, we conclude that there is more than sufficient evidence to support the circuit court's factual determinations. While defendants' version of the events is quite different from Ericka's, it is the function of the trier of fact to

determine the credibility of witnesses and resolve conflicts. In the case *sub judice*, the trial judge chose to believe Ericka and not defendants. We cannot say that this determination is against the manifest weight of the evidence. Accordingly, we proceed to our *de novo* determination of whether the law was correctly applied to the facts as found by the circuit court.

Applying the law to the facts of the instant case, we find the circuit court did not err. First, it is uncontroverted that Joel lives indefinitely on a full-time basis with Ericka. Second, it is also clear that Ericka exercises complete control over Joel and is fully responsible for his care to the exclusion of Joel's parents, who reside in another country. Third, Ericka is Joel's legal guardian. Fourth, there was ample evidence of other noneducational factors being a part of the reason Joel moved to Melrose Park: the abject poverty and lack of social and economic opportunities he faced in Mexico; the desire to learn more about the country of his birth; and the need to eventually aid his parents financially. All of these factors support the circuit court's legal conclusion that Joel was a *bona fide* resident of District 83 and that his move to the district was not solely for educational purposes. Thus, we find no error in the circuit court's decision.

In closing, we note that defendants argued before the circuit court and this court that a deferential policy of *experto credite* should be adopted with regard to residency determinations made by school districts. To this end, defendants attempt, without citation to any relevant authority, to analogize school disciplinary cases, where courts have correctly afforded deference to a school's decision, to residency determinations. We find this argument to be wholly without merit and completely unsupported by the case law.

In light of the foregoing, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RAKOWSKI and O'MARA FROSSARD, JJ., concur.