In re GUARDIANSHIP OF K.R.J., a Minor (Keith William Peterson *et al.*, Petitioners-Appellants, v. Gene Joseph Jensen, Respondent-Appellee (Kimberly Stark, Respondent)).

Fourth District    No. 4—10—0454

Opinion filed November 15, 2010.

Daniel B. Kennedy, of Champaign, for appellants.

Kathleen A. Finney, of Law Office of Kathleen A. Finney, P.C., of Rantoul, for appellee.

Mark C. Palmer, of Champaign, guardian *ad litem*.

PRESIDING JUSTICE MYERSCOUGH delivered the opinion of the court:

Petitioners, Keith William Peterson and Katherine Marie Peterson, are the maternal stepgrandfather and grandmother of K.R.J. (born December 28, 2000). Petitioners filed a petition for guardianship of K.R.J., alleging that K.R.J.'s parents, respondents, Gene Joseph Jensen and Kimberly Stark, were unable to make and carry out day-to-day child-care decisions concerning K.R.J. The allegations pertaining to Gene centered around Gene's treatment of Gene's two sons and Kimberly's daughter. In January 2009, Kimberly was defaulted and is not a party to this appeal.

In June 2010, following a series of evidentiary hearings, the trial court found Gene's sons and Kimberly's daughter lacked credibility.

The court concluded that petitioners failed to rebut the presumption that Gene was able to make and carry out day-to-day child-care decisions concerning K.R.J. Petitioners appealed.

This court finds the trial court's factual findings were not against the manifest weight of the evidence and that the court did not err by finding petitioners failed to rebut the presumption that Gene was able to make and carry out day-to-day child-care decisions concerning K.R.J. Therefore, we affirm.

## I. BACKGROUND

In August 2006, petitioners filed a verified petition for guardianship of K.R.J. The petition alleged that Gene was unable to make and carry out day-to-day child-care decisions concerning K.R.J. because Gene had his two sons, Robert and Raymond, removed from his care in a juvenile court proceeding and had tortured Kimberly's daughter, B.S.

In February 2007, the trial court dismissed the petition with prejudice. The court found petitioners failed to allege sufficient facts that Gene and Kimberly were unable to make and carry out day-to-day child-care decisions concerning K.R.J. Petitioners chose not to replead and appealed.

This court reversed and remanded. *In re K.R.J.*, No. 4—07—0139 (July 10, 2007) (unpublished order under Supreme Court Rule 23). Specifically, this court directed the trial court to hold an evidentiary hearing to determine whether petitioners rebutted the presumption that Gene and Kimberly were able to make and carry out day-to-day child-care decisions regarding K.R.J. *K.R.J.*, slip order at 24.

On five days between July 2009 and April 2010, the trial court held evidentiary hearings to determine whether petitioners rebutted the presumption that Gene was able to make and carry out day-to-day child-care decisions concerning K.R.J. The evidence presented at the hearings can be summarized as follows.

### A. Testimony Regarding Raymond, Robert, and B.S.

The allegations in the petition centered around Gene's treatment of children other than K.R.J. This court held in the first appeal that Gene's conduct toward other minor children could support a finding that Gene was unable to make and carry out day-to-day child-care decisions regarding K.R.J. *K.R.J.*, slip order at 23.

Gene and Kimberly were in a relationship and lived together from approximately 1999 until 2006. In 1999 and 2000, Gene's sons from a previous marriage, Robert (born May 24, 1987) and Raymond (born May 28, 1989), visited Gene in the summer and on holidays, as did Kimberly's daughter, B.S. (whose date of birth does not appear in the

record, but she was apparently born in 1992). Gene's son, Robert, has a rare chromosomal disorder, is mentally five years old, has epilepsy, a behavioral disorder, and is borderline schizophrenic.

In June 2000, Robert returned home from visitation with Gene with bruises on his behind and down his legs. Gene's ex-wife, Djuana Hilderbrand, filed a report with the police, and Gene was charged with aggravated battery to a handicapped person. Both Hilderbrand and Gene testified that the criminal case ended in a mistrial because Raymond changed his testimony. The charges were dropped.

The same incident also resulted in a juvenile proceeding, Champaign County case No. 00—JA—71. Hilderbrand obtained an order of protection against Gene during the course of the juvenile proceedings.

Gene denied the abuse, but he testified he was indicated by the Illinois Department of Children and Family Services (DCFS) for striking Robert with a belt. The court also heard evidence suggesting Gene was indicated by DCFS in 1992 for injury to Robert.

Gene testified he did everything he was asked to do during the juvenile proceedings, including anger-management classes, parenting classes, and counseling. At the conclusion of the juvenile case in December 2001, Gene was allowed to return home to Kimberly and K.R.J. (Gene testified he had been required to move out when the juvenile proceeding began). According to Gene, DCFS found he was not a risk to K.R.J. Hilderbrand was awarded custody and guardianship of Robert and Raymond.

In 2003, Hilderbrand and the boys moved to Georgia, and Gene had not seen them since. Hilderbrand testified she sought an order of protection against Gene in 2003. Records contained in the record on appeal demonstrate that the order of protection was granted. Katherine paid for Hilderbrand's attorney in the 2003 order-of-protection case.

Also in 1999 and 2000, Kimberly's daughter, B.S., from her previous marriage to Joe S., visited Kimberly and Gene's home during the summer. Joe had been granted temporary custody of B.S. in 1996 during the divorce proceedings and Kimberly was awarded supervised visitation. Kimberly testified Katherine paid for Joe's attorney and testified against Kimberly in the divorce proceedings.

By 1999 or 2000, B.S. was residing with Katherine, who allowed Kimberly unsupervised visitation with B.S. However, visitation between Kimberly and B.S. stopped in 2003 when Kimberly stopped having contact with Katherine. In 2005, petitioners petitioned for and obtained guardianship of B.S. Kimberly testified she did not receive notice of that guardianship proceeding until 2005 when she received the court order.

Raymond, Robert, and B.S. all testified. B.S., age 17, testified *in camera* that she currently resided in Maryville. Katherine described Maryville as a residential academy for young girls who have been traumatized or abused. B.S. testified she suffered from post-traumatic stress disorder, self-harming, and an eating disorder. She had a history of hospitalizations.

B.S. testified she was afraid of Gene because he hurt her, Robert, and K.R.J., and he sexually abused B.S. B.S. did not report any of the abuse until she was 13 years old (approximately 2005).

B.S. described the physical abuse as "five hits" with a belt on her behind. B.S. also testified Gene once wrapped her in duct tape. B.S. testified that from ages 8 to 12, Gene fondled her and Kimberly "did it with him."

B.S. testified she saw Gene hit Robert with a belt. On examination by the trial court, however, she explained she was not in the room when Gene hit Robert with the belt. She could hear Gene yelling and Robert screaming. She heard six or seven blows. According to B.S., the incident occurred from 6 p.m. until 10 p.m.

Raymond, age 20, testified he was afraid to come into the courtroom because it brought back horrible memories of abuse by Gene. When Raymond was in fourth and fifth grade, Gene would "whoop" or spank him with a belt or his hand. Raymond testified Gene spanked him for poor grades or doing something wrong. When spanked, Gene usually hit him one to four times on the behind or the legs, depending on how mad Gene was.

Robert, age 22, testified *in camera*. When asked why he cried when he entered the courtroom, Robert stated, "My father." Robert did not like Gene because Gene "whooped" him with a belt. When asked how many times, Robert testified he did not know. When asked if it was more than once, Robert testified, "Yeah." When asked if it was more than twice, Robert testified, "I don't know." Robert did not know if Gene hit B.S. or Raymond.

Gene denied fondling or hitting B.S. Gene also denied wrapping B.S. in duct tape. Gene recalled being contacted by DCFS regarding B.S.'s allegations of sexual abuse but could not remember the time frame. He was not indicated by DCFS for those allegations.

Gene testified he only used a belt on Robert one time—in June 2000—because Hilderbrand had told him she was having problems with Robert and that the only way she could get him to do something was to threaten the belt. On that occasion, Gene hit him three times and did not observe any welts. Gene denied ever using the belt on Raymond or B.S. Kimberly also testified that Gene spanked Robert but not Raymond and did not assault either boy. Kimberly was only asked whether Gene kicked B.S., and she testified he did not.

Gene testified his parental rights to Robert and Raymond had not been terminated. Gene believed B.S. testified she was afraid of him because of things Katherine told her that were not true. As for Robert and Raymond, Gene believed they had years of people telling them Gene was not a good person.

### B. Testimony Regarding Kimberly and Katherine's Relationship

Kimberly testified on Gene's behalf and provided information that the trial court viewed as information about Katherine's motivation. Kimberly testified she was sexually abused by her adoptive father, Katherine's second husband Terry. When Kimberly was 20 years old, she told Katherine about the sexual abuse. Katherine told her she deserved it.

Katherine testified she did not learn of the abuse until 1996. Katherine agreed, however, that shortly thereafter, she made allegations to DCFS about Kimberly's parenting.

Kimberly testified when she was pregnant with B.S., she and Katherine got into an argument. Katherine threw a bowl at Kimberly, grabbed Kimberly by the throat, and told Kimberly the baby she was carrying was Katherine's baby.

In 2003, Kimberly attempted to obtain an order of protection against Katherine—in part because Katherine threatened to kidnap K.R.J.—but the petition was denied. Kimberly testified that through therapy she has realized any relationship with Katherine was lethal to her well-being.

### C. Testimony Regarding K.R.J.

When Gene and Kimberly broke up in 2006, they agreed it was best for K.R.J. to be with Gene in Rantoul, Illinois. No formal custody agreement was entered into between them. Kimberly testified K.R.J. initially went to live with Gene because Kimberly was not financially stable and Kimberly felt the fewer changes in K.R.J.'s life, "the less chance we had for my mother to be able to get her." In spring 2007, Gene and K.R.J. moved to Kansas. Kimberly believed K.R.J. was safer in Kansas, out of Katherine's reach.

Gene testified he was employed in Kansas. Gene believed he was a fit parent because he was caring and strong-willed. He loved K.R.J. and believed it was in her best interests to stay with him. Gene punished K.R.J. by way of time-outs and did not use corporal punishment.

K.R.J., age 8, was doing well in school. She testified, *in camera*, that she liked living in Kansas with her father, Gene. K.R.J. talked to her mom, Kimberly, on the phone three times a week. Kimberly lived in Illinois.

K.R.J.'s paternal aunt, Susan Ballard, provided day care to K.R.J. Ballard testified K.R.J. was outgoing, good with other children, and had no problems at school. Ballard testified that Gene punished K.R.J. by taking things away or putting K.R.J. in time-out.

Kimberly testified K.R.J. is the "light of [Gene's] life" and that when K.R.J. and Gene see each other, "their faces light up." Kimberly had never seen Gene physically discipline K.R.J. or inappropriately touch her.

### D. The Guardian *Ad Litem* Report

The guardian *ad litem* (GAL) prepared a report. The GAL made clear at the last evidentiary hearing that the recommendation in the report—that petitioners should be granted guardianship—pertained only to the best-interests determination, not the initial determination of whether petitioners (1) rebutted the presumption that Gene was willing and able to make and carry out day-to-day child-care decisions and (2) demonstrated that Gene was not competent to transact his own business and was not a fit person.

### E. The Trial Court's Decision

In June 2010, the trial court found petitioners had failed to rebut the presumption that Gene was able to make and carry out day-to-day child-care decisions regarding K.R.J. The court did not find B.S., Robert, or Raymond credible.

Specifically, the trial court found B.S. was very emotionally and mentally disturbed and not a credible witness. The court stated, "I just cannot find that the, the abuse occurred of a sexual nature."

The trial court also found Robert's and Raymond's "record for veracity was not particularly good." The court noted Robert and Raymond perceived Gene had physically beaten them with a belt on many occasions but their actual testimony showed the duration and number of times it occurred was greatly exaggerated by them.

The trial court recognized Robert and Raymond had a "very large amount of bias toward their father." However, the court found Robert's and Raymond's intense dislike and fear of Gene was not substantiated by the record. The court specifically noted Gene had not been convicted for abusing Robert. The court also stated that orders of protection are sometimes entered because of the perceptions of the victim without a strong showing that there was, in fact, a likelihood of harm.

The trial court further noted that Gene had done everything required of him by DCFS regarding counseling, anger-management, and parental training. The court stated:

> "So I think to a large extent, if there was error in the way he reared his children or children in his house, and I have found that

to the extent there was, that is not something that is likely to reoccur in the future."

Finally, the trial court mentioned Kimberly's testimony that Gene was doing a good job raising K.R.J. and had done so over the last several years. The court also noted Kimberly's testimony regarding Katherine's motivations. The court found "there was a—definitely was and still is a serious problem between Kimberly Stark and her mother, Katherine Peterson." The court concluded as follows:

"The court has indicated that it did not find that Gene Jensen tortured [B.S.] [B.S.'s] accounts of that are unreliable and exaggerations. I do not find that he tortured Robert Jensen or Raymond Jensen. Certainly[,] he has not tortured [K.R.J.] Therefore, I am finding that the petition should be dismissed because the co-petitioners have not rebutted the presumption that respondent, Gene Jensen, is able to care—to make and carry out day-to-day child[-]care decisions regarding K[.]R[.]J. Therefore, the petition is dismissed."

This appeal followed.

## II. ANALYSIS

This court first notes that although Gene moved K.R.J. to Kansas after the filing of the petition, the trial court retained jurisdiction because Illinois was K.R.J.'s home state when the petition was filed. See 750 ILCS 36/201(a)(1) (West 2008) (providing that an Illinois court has jurisdiction to make an initial custody determination if Illinois is the home state of the child when the proceeding is commenced).

### A. Appointment of a Guardian of a Minor Under the Probate Act

The appointment of a guardian of a minor is governed by sections 11—1 through 11—18 of the Probate Act of 1975 (Probate Act) (755 ILCS 5/11—1 through 11—18 (West 2008)). The Illinois Supreme Court has described section 11—5(b) of the Probate Act as providing the standing requirement petitioners must meet before the trial court has jurisdiction to proceed on the petition. *In re R.L.S.*, 218 Ill. 2d 428, 436, 844 N.E.2d 22, 28 (2006) (providing that "standing" in this context means the "threshold statutory requirement that had to be met before the court could proceed to a decision on the merits"); see also 755 ILCS 5/11—5(b) (West 2008).

■ To have standing to proceed on a petition for guardianship of a minor where the minor has a living parent whose parental rights have not been terminated and whose whereabouts are known, the petitioner must rebut the statutory presumption that the parent is "willing and able to make and carry out day-to-day child[-]care decisions concern-

ing the minor." 755 ILCS 5/11—5(b) (West 2008) (providing threshold requirements for the petition and the statutory presumption). This statutory "presumption may be rebutted by a preponderance of the evidence." 755 ILCS 5/11—5(b) (West 2008).

If, as the trial court found here, the petitioner fails to rebut the presumption, the petitioner lacks standing, and the trial court lacks jurisdiction to proceed on the petition. See 755 ILCS 5/11—5(b) (West 2008); *R.L.S.*, 218 Ill. 2d at 448, 844 N.E.2d at 34 ("[t]he petitioners lack standing to proceed with their petition unless the court determines that they have rebutted the presumption that [the] respondent is willing and able to make day-to-day child-care decisions"). Only if the petitioner rebuts the presumption does the court determine whether the parents are fit persons who are competent to transact their own business. See 755 ILCS 5/11—7 (West 2008). If so, the parents are entitled to custody. *R.L.S.*, 218 Ill. 2d at 447, 844 N.E.2d at 34 (fit parents are entitled to custody). If not, the court determines the minor's best interests. See 755 ILCS 5/11—5(a) (West 2008) (a trial court may appoint a guardian as the court finds in the minor's best interests).

## B. Standard of Review Is Mixed

The parties assert that this court reviews the trial court's determination under the manifest-weight-of-the evidence standard. We disagree and instead conclude the standard of review is mixed.

■ Generally, the question of standing is reviewed *de novo*. See, *e.g.*, *In re Custody of M.C.C.*, 383 Ill. App. 3d 913, 918, 892 N.E.2d 1092, 1097 (2008) (reviewing *de novo* whether the maternal grandmother had standing to pursue a petition for custody of her granddaughter under the Illinois Marriage and Dissolution of Marriage Act). However, the trial court here also heard evidence and made certain factual findings. Where a trial court makes factual findings, this court reviews those factual findings under the manifest-weight-of-the-evidence standard. See, *e.g.*, *In re Gloria C.*, 401 Ill. App. 3d 271, 282, 929 N.E.2d 1136, 1145-46 (2010) (involuntary-administration-of-psychotropic-medication case applying the manifest-weight-of-the-evidence standard to the trial court's factual findings).

Consequently, this court will review the trial court's factual findings under the manifest-weight-of-the-evidence standard and apply those facts *de novo* to the question of whether petitioners have standing; that is, whether they rebutted the presumption that Gene was willing and able to make and carry out day-to-day child-care decisions regarding K.R.J. See, *e.g.*, *In re Marriage of Baumgartner*, 237 Ill. 2d 468, 486-87, 930 N.E.2d 1024, 1034 (2010) (providing that a mixed

standard of review would apply to question of emancipation of a minor; findings of historical fact should be reviewed under manifest-weight-of-the-evidence standard while the ultimate question of emancipation should be reviewed *de novo*).

## C. Trial Court's Factual Findings Were Not Against the Manifest Weight of the Evidence and the Court Did Not Err by Finding Petitioners Lacked Standing

Petitioners argued in the trial court that Gene was unable to carry out day-to-day child-care decisions concerning K.R.J. because Raymond and Robert were removed from his care and he tortured B.S. The trial court found, however, that (1) Gene did not torture Robert, Raymond, B.S., or K.R.J.; and (2) even if Gene had, in the past, made errors in the way he reared children in his home, such errors were not something likely to recur.

As noted above, this court will not disturb the trial court's findings unless they are against the manifest weight of the evidence. *Gloria C.*, 401 Ill. App. 3d at 282, 929 N.E.2d at 1145-46. "A finding of fact *** is against the manifest weight of the evidence where, upon review of all the evidence in the light most favorable to the prevailing party, an opposite conclusion is clearly apparent or the fact finder's finding is palpably erroneous and wholly unwarranted, is clearly the result of passion or prejudice, or appears to be arbitrary and unsubstantiated by the evidence." *Joel R. v. Board of Education of Mannheim School District 83*, 292 Ill. App. 3d 607, 613, 686 N.E.2d 650, 655 (1997).

█ Here, the trial court's factual findings were not against the manifest weight of the evidence. The testimony of B.S., Raymond, and Robert was very disturbing, as was their expressed fear of Gene. However, the trial court was in the best position to judge the witnesses' credibility. *Joel R.*, 292 Ill. App. 3d at 613, 686 N.E.2d at 655 (the trial court is in a superior position to observe the witnesses' demeanor and judge their credibility). The court simply did not believe the testimony of B.S., Robert, and Raymond and found them not credible.

The trial court also heard Gene's denials that abuse occurred and was in a better position to determine the credibility of those denials. The court's decision to believe Gene and Gene's witnesses over petitioners' witnesses was not against the manifest weight of the evidence. See, *e.g., Joel R.*, 292 Ill. App. 3d at 613, 686 N.E.2d at 655 (trial court is in a superior position to resolve conflicts in the evidence).

Moreover, the trial court heard evidence that Gene did everything DCFS asked him to do during the juvenile court proceedings pertain-

ing to Robert. At the close of the juvenile case, DCFS allowed Gene to return home with K.R.J. Gene testified his parental rights to Raymond and Robert were not terminated. These facts support the court's conclusion that even if there were error in how Gene raised the children in his home, it was not likely to recur. After reviewing all of the evidence, this court concludes that the court's factual findings were not against the manifest weight of the evidence.

Having found the trial court's factual findings were not against the manifest weight of the evidence, this court must review, *de novo*, whether the law was correctly applied to the facts.

The trial court found no credible evidence of torture or abuse. Gene and Kimberly both testified that Gene was the primary caretaker for K.R.J. and that K.R.J. was doing well in his care. This court agrees with the trial court's legal conclusion that petitioners did not have standing to bring the petition because they failed to rebut the presumption that Gene was willing and able to make and carry out day-to-day child-care decisions regarding K.R.J. See, *e.g.*, *In re Estate of Johnson*, 284 Ill. App. 3d 1080, 1091-93, 673 N.E.2d 386, 393-94 (1996) (reversing trial court's award of custody to a nonparent, finding the nonparent did not have standing to petition for guardianship and custody of the minor; the evidence did not rebut the presumption that the father was willing and able to make and carry out day-to-day child-care decisions regarding the minor).

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT and POPE, JJ., concur.