2021 IL App (1st) 200575-U

FIFTH DIVISION
July 16, 2021

No. 1-20-0575

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| ESTATE OF BARBARA ROSE CHRISTO, a disabled person, by CHARLES P. GOLBERT, Cook County Public Guardian, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 15 L 12846[1] |
| THE LAW OFFICES OF THOMAS LEAHY; LEAHY & HOSTE, an Illinois general partnership; THOMAS LEAHY, an individual; PETER D. HOSTE, an individual; DENNIS H. STEFANOWICZ, an individual; THE ESTATE OF SAMUEL V.P. BANKS; and PETER CHRISTO, an individual, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| (The Law Offices of Thomas Leahy; Leahy & Hoste; Thomas Leahy; Peter D. Hoste; and Dennis H. Stefanowicz, Defendants-Appellees). | ) ) ) ) | Honorable Lorna E. Propes, Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Cunningham concurred in the judgment.

---

[1] This case was originally numbered 2010 L 5919 in the circuit court. However, the circuit court stayed the case early in the proceedings. When the court removed this case from the stay calendar, it also renumbered the case.

**ORDER**

¶ 1    *Held*:   In this action for legal malpractice, we reverse the circuit court's judgment in favor of defendants. The court's findings of fact were against the manifest weight of the evidence. Reversed and remanded.

¶ 2    In 1998, defendant attorneys Thomas Leahy, Peter D. Hoste, Dennis H. Stefanowicz, and their firm The Law Offices of Thomas Leahy—later Leahy & Hoste—(collectively "the Leahy defendants") were retained to represent Peter Christo, Fay Christo, and Barbara Rose Christo in an action for the wrongful death of their late father, Thomas Christo.[2] In 2002, Peter, Fay, and Barbara each received approximately $550,000 as their shares of the proceeds from that case.[3] In 2008, in a proceeding initiated by Barbara's mother Lucy Christo, the circuit court adjudicated Barbara to be a disabled person and appointed the Cook County Public Guardian (the Public Guardian) as guardian of her estate and person.

¶ 3    In 2010, the Public Guardian filed this suit, alleging, *inter alia*, that Peter fraudulently misappropriated the bulk of Barbara's share of the proceeds from the wrongful death action, and that the Leahy defendants had committed professional negligence by failing to seek a guardianship for Barbara or otherwise protect her interests before distributing the funds.[4] Following a bench trial, the circuit court ruled in the Leahy defendants' favor on all counts. We reverse the judgment of the circuit court and remand for a new trial.

---

[2] Because this case involves several individuals from the Christo family, we refer to them by their first names.

[3] During the trial at issue before us and at oral argument on this appeal, there was some discussion about whether the wrongful death case resulted in a settlement or a judgment. The circuit court and the parties apparently agreed, however, that it made no difference. Throughout the proceedings, the parties referred to the resolution as a settlement.

[4] Before trial, the Estate of Samuel V.P. Banks was voluntarily dismissed from this case pursuant to a settlement agreement. After trial, but before judgment, the Public Guardian, acting on behalf of its ward, also reached a settlement with Peter Christo. Those defendants are not parties to this appeal.

¶ 4                                    BACKGROUND

¶ 5     The Public Guardian originally filed this case in 2010. Before it reached trial, Thomas Leahy passed away. The operative second amended complaint included two counts of professional negligence against the Leahy defendants. The Public Guardian alleged that the defendants committed professional negligence by failing to notify the probate court[5] of Barbara's disability; failing to secure a guardian of Barbara's estate; failing to protect Barbara's interests in the wrongful death proceeds; and committing "other negligent acts."

¶ 6     The first witness to testify at the bench trial in this case was Dawn Lawkowski-Keller, an attorney in the office of the Public Guardian. Lawkowski-Keller testified that Lucy Christo initiated guardianship proceedings in 2007. In those proceedings, Barbara was assigned a guardian *ad litem*, who filed a report stating concerns that Barbara had been financially exploited. After the case was referred to the Public Guardian, the Public Guardian was only able to locate a single bank account in Barbara's name. That account, Lawkowski-Keller later learned, had been opened as a joint account with Peter, and had been the depository for Barbara's proceeds from the wrongful death action.

¶ 7     Lawkowski-Keller testified that the Public Guardian relied on a 2007 report by Dr. Mary Schmidt that Barbara has "mild mental retardation," an IQ of 51, a second-grade reading level, and "is unlikely to manage a budget or handle any basic money transaction."

¶ 8     As part of her investigation related to the guardianship proceedings, Lawkowski-Keller learned that in 1983, Barbara went to live at a group home for people with intellectual disabilities. Barbara then lived with Lucy, on and off, and at various group homes. In 2008,

---

[5] The parties use the nomenclature "probate court" when referring to the Probate Division of the Circuit Court of Cook County.

Barbara was living at a nursing home. At the time of trial, Barbara lived in "an independent community living arrangement" with "complete and total assistance."

¶ 9    Lawkowski-Keller testified that, to evaluate Barbara's financial abilities, she gave Barbara a $25 gift card and took her to a convenience store. At the store, Lawkowski-Keller observed that Barbara was unable to read the prices or calculate how much she could buy with the gift card. She also learned that Barbara's difficulties with numbers rendered her unable to tell time or make telephone calls.

¶ 10    Lawkowski-Keller testified that in 2007, the Illinois Department of Children and Family Services (DCFS) took custody of Barbara's two children and that when Barbara's case was first referred to the Public Guardian, there was a pending juvenile court case regarding Barbara's parental rights. She testified that Barbara's parental rights had been terminated.

¶ 11    The Public Guardian then called Peter Hoste as an adverse witness. Hoste testified that he initially worked as an associate with Thomas Leahy's firm and eventually was promoted to partner. Hoste testified that Peter Christo retained the firm to prosecute an action for the wrongful death of his father Thomas Christo. Thereafter, Barbara signed a fee agreement with the firm. Hoste testified that Thomas Leahy met with Barbara before the wrongful death complaint was filed. Barbara lived on her own when Leahy visited her.

¶ 12    Hoste testified that he and Leahy tried the wrongful death case together. During the trial, Barbara testified briefly and without cross-examination. When Leahy asked her if she had a disability, she answered, "No." During closing argument in the wrongful death trial, Leahy stated, "Barbara is a special person. We could tell from the stand—from the witness stand. We could tell that from the tenor of her answers. She denied it, and good for her, but I think we can tell that she was." Hoste testified, "I think the purpose of that argument was probably to make

4

her a more likable person, explain the situation of the family to the jury to maximize the recovery for the family."

¶ 13    The Public Guardian questioned Hoste extensively on portions of Barbara's deposition testimony in the wrongful death case. During that deposition, Barbara testified that she had a fifth-grade education and that she received Supplemental Security Income (SSI) for her disability. She testified that she received SSI because, "[t]hey say I'm slow" and "[t]hey said I can't work." The Public Guardian also questioned Hoste on a portion of the deposition of Sonya Christo, Barbara's aunt. In response to a question about whether Barbara was disabled, Sonya stated that Barbara was "a little slow."

¶ 14    The Public Guardian introduced a 2014 document from the Social Security Administration listing Barbara's disability as "mental retardation" with an onset date of September 13, 1984. Hoste testified that the firm did not request information from the Social Security Administration regarding Barbara's disability. However, he testified that Leahy would have had the primary task of assessing whether Barbara's condition required any additional protections under the Rules of Professional Conduct, and that Leahy "was very consciousness [*sic*] about such things." Hoste stated that "we would have likely brought [Barbara's condition] to the attention of somebody" had she been as apparently disabled during the wrongful death representation as she was when the Public Guardian was appointed. However, he testified, "that wasn't her condition back [then]."

¶ 15    Hoste also testified that while the firm represented Barbara, she lived on her own with her daughter. Although DCFS had initially taken custody of Barbara's first child, he testified, Barbara successfully completed parenting classes and had her child returned.

¶ 16    Hoste admitted that on both the petition for letters of administration and an affidavit of heirship in the wrongful death case—both of which were prepared by the law firm—Barbara was listed as "[n]either minor nor disabled." He also testified that neither document was later amended to indicate that Barbara was disabled. Hoste testified he had no recollection of requesting a guardianship for Barbara's share of the wrongful death proceeds.

¶ 17    The Public Guardian then called Dennis Stefanowicz as an adverse witness. He testified that he was an associate with the Leahy law firm while the wrongful death case was pending. He testified that he signed both the petition for letters of administration and affidavit of heirship in which Barbara was listed as "[n]either minor nor disabled."

¶ 18    Stefanowicz testified that he prepared for and attended Barbara's deposition in the wrongful death action. At that time, he "didn't have the impression that she had a diagnosed disability." He testified that she handled the deposition well and "answered the questions the best she could."

¶ 19    On cross-examination, Stefanowicz testified that nothing in Barbara's appearance or behavior made him think that he needed to take any extraordinary precautions. He testified that Barbara lived alone at the time of the deposition and that she had been working with therapists and counselors to regain custody of her first child. Stefanowicz testified that the fact that those health professionals evidently did not believe that Barbara needed a guardian factored heavily into his analysis of Barbara's mental capacity. Moreover, he testified, long depositions can be difficult for anybody, "[e]specially when it revolves around the death of a father or parent."

¶ 20    As a matter of economy, Stefanowicz then testified in the defendants' case-in-chief. He had been disclosed as an expert witness, and he opined that the Leahy defendants had satisfied their duty of care. Based on his review of the relevant documents, his own personal experience

with Barbara, and his understanding of rule 1.14 of the Illinois Rules of Professional Conduct, Stefanowicz opined that the Leahy defendants had no reason to treat Barbara any differently than any other client.

¶ 21    The next witness was Dr. Alan Jaffe. Dr. Jaffe testified that he was a clinical and forensic psychologist and that he had performed an evaluation on Barbara in 2018. The evaluation consisted of a battery of tests, including two IQ tests. In one of the IQ tests Barbara scored in the second percentile; in the other she scored in the first Dr. Jaffe also summarized the other tests and concluded that Barbara's consistent results provided cross-validation and "very good intratest reliability."

¶ 22    Dr. Jaffe testified that, based on Barbara's condition and test results, he would have expected similar results had she been tested during her representation by the Leahy defendants. He opined that Barbara "has suffered from a cognitive disorder and mental retardation since birth to the present time." He testified that Barbara's condition was "a longstanding early onset problem" for which there is no treatment. He opined that Barbara's mathematical abilities would be comparable to those of a second or third grader, and that she was unable to function independently.

¶ 23    Dr. Jaffe testified that Barbara's "handicap, her compromised mental functioning, would be observable to an untrained person within just a couple of minutes of interacting with her." He continued, "Barbara Christo would be unable to make any competent decision about her financial welfare."

¶ 24    On cross-examination, Dr. Jaffe acknowledged that his opinion was not based on any medical records created earlier than 2007. He also acknowledged that he is neither a medical doctor, nor was he board certified at the time that he evaluated Barbara. Dr. Jaffe also testified

that Barbara arrived on time to her appointments. She was appropriately dressed and groomed. During the evaluation, Dr. Jaffe observed Barbara to be alert, oriented, respectful, and cooperative. She also maintained good eye contact and stayed focused. According to Dr. Jaffe, Barbara's speech patterns were appropriate, as were her volume and tone of voice. Dr. Jaffe did not observe any thought disorder, such as hallucinations. However, he pointed out, these sorts of observations could just as easily be made of a seven-year-old child. Dr. Jaffe maintained that Barbara's disability would have been observable within minutes of interacting with her.

¶ 25 Dr. Jaffe was also cross-examined on the report of Dr. Schmidt, upon which he had relied in forming his opinion. He acknowledged that the report stated that Barbara had regained custody of her first child in 2000. The report also stated that from that time until 2007 she lived independently in an apartment with the child. By the end of 2007, however, she gave birth to her second child and DCHF stepped in and took both children. The next year, Barbara reported that she had a nervous breakdown, made suicidal and homicidal threats, and needed to be hospitalized. According to the report, Barbara was prescribed antipsychotic medication as a result.

¶ 26 Dr. Jaffe maintained that "nervous breakdown" is not a term of art. Moreover, although the loss of custody and hospitalization may have been traumatic events that could have affected Barbara's cognitive ability "in the moment", Dr. Jaffe maintained that her specific disability could not have been caused by panic attacks or a "nervous breakdown".

¶ 27 The next witness was Ray Koenig, a practicing attorney who had published several scholarly articles on probate practice and represented clients in "[h]undreds, if not thousands" of guardianship matters. Koenig testified that he had been retained to provide an expert opinion in

8

this case. To form that opinion, he reviewed documents and depositions from the wrongful death case and depositions from this case.

¶ 28    Koenig opined that the Leahy defendants "owed a duty to advise the probate court of the likely diminished capacity of Barbara Christo in the—that they had learned from their representation in [Thomas Christo's] estate as well as in the [wrongful death] case." He also opined that the Leahy defendants breached that duty by failing to bring Barbara's "likely diminished capacity" to the probate court's attention. Koenig testified that the Leahy defendants were not necessarily required to amend the filings that listed Barbara as "neither minor nor disabled", but they did have a duty to bring Barbara's condition to the court's attention.

¶ 29    Koenig testified that, had the Leahy defendants brought Barbara's "likely diminished capacity" to the attention of the court:

> "a probate judge *** would ask the attorneys for a basis, and then they would—if they agreed there was a concern, they would either invite [Barbara] in to talk to them or they would appoint a guardian *ad litem* in the decedent's estate to interview the person and report back to the court on the concerns."

The probate court, Koenig continued, would then "ask the [guardian *ad litem*] whether or not a guardianship should be sought in a guardianship courtroom in the adult estate."

¶ 30    Koenig testified that, had a guardian been appointed, the guardian would have been subject to supervision by the court, would have had to follow an approved budget, and would have had to post a bond for 150% of the value of the estate. Peter Christo, Koenig testified, could have been appointed, but he would also have been subject to these restrictions. He testified that to succeed in a guardianship proceeding, the petitioner must show by clear and convincing evidence that the respondent "is totally incapable of making personal and/or financial decisions."

Moreover, the determination that a respondent is disabled must be supported by the report of a licensed physician.

¶ 31    Koenig also opined that the failure of the Leahy defendants to advise the probate court of Barbara's disability led to Peter receiving control of Barbara's share of the wrongful death proceeds. Consequently, he concluded that the breach of the duty to notify the probate court was the proximate cause of the alleged damages to Barbara's estate.

¶ 32    Peter Christo then testified as an adverse witness. He testified that he hired the Leahy defendants to represent him in the wrongful death case. He also testified that he took Barbara to the bank to open a joint bank account funded by Barbara's share of the wrongful death proceeds. The parties then stipulated to statements and cancelled checks from Barbara's joint account with Peter, which showed several checks payable to Peter.

¶ 33    On cross-examination, Peter testified that Barbara lived independently from 1999 until 2007. From the time that Barbara regained custody of her first child in 2000 or 2001 until shortly after the birth of her second child in 2007, Barbara kept her first child fed, made sure that she got to school, took her shopping, and kept the house clean. Peter testified that in 2007 Barbara's second child was born with severe medical issues and that DCFS took custody of both of Barbara's children shortly thereafter.

¶ 34    The Public Guardian's final witness was Thomas Glavin. Glavin testified that he had reviewed the statements and records for Barbara's joint account with Peter and had prepared a summary report. The report, which was admitted into evidence, showed that all financial transactions were initiated by Peter, not Barbara.

¶ 35    At the close of the Public Guardian's case, the Leahy defendants moved for a directed finding that the Public Guardian had failed to present a *prima facie* case as to as to any alleged

negligent acts other than failing to notify the probate court of Barbara's potential disability. They argued that the Public Guardian's standard-of-care expert had not testified, for example, that the defendants had a duty to further investigate Barbara's disability or a duty to take additional steps to protect her funds. The court granted the motion, finding that the Public Guardian had not presented any duty-of-care evidence with respect to any alleged negligence other than failing to appreciate Barbara's disability or report it to the probate court.

¶ 36    The Leahy defendants then moved for judgment on the ground that the Public Guardian had not met its burden on the issue of proximate cause. The Leahy defendants argued that, even if they had been negligent in failing to appreciate or report Barbara's disability, the evidence did not establish that such negligence was the "but-for" cause of the alleged injuries to Barbara's estate. The court denied the motion, and the trial proceeded to the Leahy defendants' case-in-chief.

¶ 37    Peter Hoste was recalled in defense. He testified about his experience dealing with clients with brain injuries and diminished capacities. He testified that Thomas Leahy had been the primary attorney working on the wrongful death case, and that Leahy had personally visited Barbara at least once. Hoste testified that the attorneys in the firm would meet regularly to discuss the status of their cases. He also testified that he had experience seeking a guardian for a client.

¶ 38    Hoste testified that the appointment of a guardian is a "serious matter" because it involves depriving one's client of his or her "right of autonomy." In making such decisions, he would consider his observations of the person, including interactions and conversations over a period of time. He also testified that he would consider other information about the case to get a complete picture. Hoste would then apply the Rules of Professional Conduct to the situation.

¶ 39    Hoste offered his opinion that he and the other the Leahy defendants had satisfied their duty of care toward Barbara. "We knew what was required under the Rules of Professional Conduct and based on our experience and our knowledge—our firsthand knowledge of Barbara Christo and all the other things that we've been talking about in this courtroom." Finally, he noted that his observations of the Christos led him to believe that Peter, Fay, and Barbara loved each other very much.

¶ 40    The final witness was James Costello. Costello testified that he was an experienced medical and legal malpractice attorney. He testified that he represented clients with a wide range of mental disabilities, be they traumatic, genetic, or developmental in nature. He testified that, over the course of his career, he had several cases for which he and his firm needed to assess whether to bring their client's disability to the court's attention. He testified that meeting with other lawyers in the firm to discuss such issues was a good practice which allowed the attorneys to make such difficult decisions. Costello testified that he had, in the past, requested the appointment of a guardian and that he was familiar with the process.

¶ 41    Costello testified that, from his review of the Illinois Pattern Jury Instructions, he concluded that the duty of care for an attorney in a professional negligence case is that he or she must possess and apply the care of a reasonably well-qualified lawyer under the same or similar circumstances. To determine what a reasonably well-qualified lawyer would have done under the circumstances of this case, Costello reviewed the then-current version of the Rules of Professional Conduct and ABA formal opinion 96-404. He also conducted independent case law research.

¶ 42    Costello opined that the Leahy defendants met their burden of care and that they were not obliged to inform the probate court of Barbara's disability. In forming his opinion, Costello

reviewed the depositions from the wrongful death case and this case, the report of Dr. Schmidt, and portions of the trial transcript from the wrongful death trial. From that evidence, Costello concluded that the Leahy defendants reasonably concluded that Barbara was competent under the meaning of rule 1.14 of the Rules of Professional Conduct. He also opined that the connection between the alleged negligence and the alleged damages was "speculative", and that the Public Guardian could not show proximate cause. In particular, he noted that Barbara's sworn testimony that she did not have a disability and the fact that she lived independently with her first child indicated that she may have objected to the appointment of a guardian.

¶ 43    When asked on cross-examination what he knew about Barbara that led him to conclude that the Leahy defendants had reasonably concluded that she was competent, Costello responded:

"She had never been adjudicated as incompetent. *** She testified under oath that she could read. She had been living independent from her family from the age of 25. She had a child who seemingly has special needs, who was returned to her. She received her Social Security check directly. And I didn't see any diagnosis, and I asked you for this, of either MRIs or anything like that that had been done prior to 2002 when these monies were distributed. And the social worker—and Barbara talked about this in her deposition, the social worker looked at Barbara, presumably made the assessment and suggested to Barbara that she obtain her GED."

¶ 44    In closing, the Public Guardian argued that "[t]he standard of care required of Leahy was to inform the probate court that Barbara was disabled." The Public Guardian also argued that the

defendants' failure to comply with section 2.1 of the Wrongful Death Act[6] and Cook County Circuit Court Rule 6.4 triggered the "common knowledge exception" to the general rule that the standard of care in legal malpractice cases must be supported by expert testimony.

¶ 45    The circuit court issued a written judgment, finding in favor of the Leahy defendants on both counts against them. The court found that they had not breached their duty of care toward Barbara. The court credited Hoste's and Stefanowicz's testimony that, based on what they knew about Barbara at the time and their interactions with her, they did not believe that Barbara "suffered from a disability which rose to the level that they should recommend a guardian be appointed for her." The court noted that Hoste's and Stefanowicz's testimony comported with Dr. Jaffe's testimony that, "prior to the clinical interview he saw nothing to indicate that [Barbara] had a cognitive disability, and there was nothing to suggest that her behavior in 2002 would have been different ***.".

¶ 46    Moreover, the circuit court held that the evidence did not establish that any alleged negligent acts by the Leahy defendants proximately caused the alleged damages. The court observed that Koenig's testimony included only a cursory account of what might have occurred had Barbara's disability been raised before the probate court. That testimony, the circuit court found, "fail[ed] to address all of the steps that would have been undertaken to reach an adjudication of disability ***." Because the evidence did not prove the case-within-the-case, the circuit court held that the Public Guardian had failed to establish proximate cause.

¶ 47    It its judgment, the circuit court stated that "Dr. Jaffe could not *** render an opinion about [Barbara's] functioning in the relevant time range, from 1998 through 2002."

---

[6] Counsel for the Public Guardian actually stated that he was relying on "2.1 of the Probate Act", but he then quoted from section 2.1 of the Wrongful Death Act.

¶ 48    The Public Guardian filed a post-trial motion, which the circuit court denied. This appeal follows.

¶ 49                                    ANALYSIS

¶ 50    The Public Guardian raises two main issues on appeal, each of which has several sub-issues: (1) whether the circuit court erred in granting the Leahy defendants' motion for a partial directed finding, and (2) whether the circuit court erred in entering judgment for the Leahy defendants. For the sake of judicial economy, we begin with the Public Guardian's final argument: that the circuit court critically misstated the evidence in its judgment.

¶ 51    "To state a claim for legal malpractice, a plaintiff must plead and prove that the defendant attorneys owed the plaintiff a duty of due care arising from the attorney-client relationship, that the defendants breached that duty, and that as a proximate result, the plaintiff suffered injury." *In re Estate of Powell*, 2014 IL 115997, ¶ 12. In its judgment, the circuit court held that the Public Guardian failed to prove either breach of duty or proximate cause.

¶ 52    "[G]enerally, the standard of review in a bench trial for a legal malpractice action is whether the court's judgment was against the manifest weight of the evidence." *Nelson v. Quarles & Brady, LLP*, 2018 IL App (1st) 171653, ¶ 124 (citing *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002)). "A judgment is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings *** are unreasonable, arbitrary, and not based upon any of the evidence." *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 106 (1995). This deferential standard is employed "because the trial judge, as a trier of fact, is in a superior position to observe witnesses, judge their credibility, and determine the weight their testimony should receive." *Battaglia v. 736 N. Clark Corp.*, 2015 IL App (1st) 142437, ¶ 23. In this case,

however, the record affirmatively shows that the circuit court made findings entirely inconsistent with the evidence.

¶ 53    The judgment states that "Dr. Jaffe could not *** render an opinion about [Barbara's] functioning in the relevant time range, from 1998 through 2002." That is an irreconcilable misstatement of the evidence. In fact, Dr. Jaffe opined that Barbara "has suffered from a cognitive disorder and mental retardation since birth to the present time." He testified that Barbara was likely as impaired in 2002 as she was when she was adjudicated incompetent in 2007. He also testified that, during the relevant timeframe, Barbara's disability would have been evident to anybody who interacted with her for a couple of minutes. Finally, Dr. Jaffe testified that her specific condition could not have been caused by Barbara losing custody of her children or by her hospitalization.

¶ 54    The circuit court's misstatement of that piece of evidence is crucial because that evidence was central to the Public Guardian's theory on both breach of duty and causation. Ray Koenig opined that the Leahy defendants had breached their duty to notify the probate court of Barbara's condition. He also opined that, had they done so, the court would have appointed a guardian for Barbara's estate. Both of those opinions were underpinned by Dr. Jaffe's opinion about Barbara's disability during the relevant time.

¶ 55    As to breach of duty, Dr. Jaffe's opinion supports the Public Guardian's theory that the Leahy defendants must have recognized Barbara's disability. He testified that Barbara's disability would have been evident to any layperson who spent only a couple of minutes interacting with her. The evidence showed that Leahy, Hoste, and Stefanowicz all spent time with Barbara during the wrongful death case. Taken together, the evidence plausibly shows that the Leahy defendants knew the extent of Barbara's disability yet still failed to notify the court.

16

¶ 56    Dr. Jaffe's opinion is equally crucial to the proximate cause analysis. The circuit court observed that Koenig's testimony was speculative as to most of the procedural steps that may have followed a report by the Leahy defendants to the probate court. However, that analysis totally disregards the testimony of Dr. Jaffe. When Dr. Jaffe's opinion is considered, the procedural steps described by Koenig become much clearer. Koenig testified that, had the Leahy defendants brought Barbara's disability to the attention of the probate court, the court "would either invite [Barbara] in to talk to them or they would appoint a guardian *ad litem* in the decedent's estate to interview" her. According to Dr. Jaffe, had either the court or a guardian *ad litem* spent just a couple of minutes interacting with Barbara, her condition would have been evident to them. The court would then have advanced to guardianship proceedings, where her disability would have been equally apparent to the reporting physician and, if necessary, the jury.

¶ 57    In sum, the circuit court's finding that "Dr. Jaffe could not *** render an opinion about [Barbara's] functioning in the relevant time range, from 1998 through 2002" was against the manifest weight of the evidence. The Public Guardian argues that this court should simply enter judgment in its favor. See *Allstate Insurance Co. v. Horn*, 24 Ill. App. 3d 583, 592 (1974) ("Where a cause is tried by a court without a jury, and where the parties have had the opportunity to present all their evidence, as in the instant case, no useful purpose is served by remanding the matter to the trial court for a new trial.") In essence, the Public Guardian requests a judgment n.o.v.[7] "[A] judgment n.o.v. is properly entered in those limited cases where 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Maple v. Gustafson*, 151 Ill. 2d

---

[7] Although the concept of a judgment n.o.v. is generally applied to jury trials, there is no logical reason not to apply the concept in the context of a bench trial. See *Salazar v. Board of Education of Mannheim School District 83*, 292 Ill. App.3d 607, 612 n. 1 (1997) (noting that any distinction between findings of fact made by a jury as opposed to by a court is "meaningless").

445, 453 (1992) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494 (1967)). "Most importantly, a judgment n.o.v. may not be granted merely because a verdict is against the manifest weight of the evidence." *Id.* We therefore decline the request to enter judgment in favor of the Public Guardian. Rather, we remand the case for a new trial.

¶ 58    Given our holding on this issue, we do not reach the Public Guardian's arguments regarding the motion for directed verdict or its other theories of liability. The testimony of Dr. Jaffe preceded the motion for directed finding, so the circuit court's ruling on that motion was potentially affected by its clearly erroneous interpretation of the evidence.

¶ 59                                    CONCLUSION

¶ 60    We reverse the circuit court's judgment in favor of defendants and remand for a new trial.

¶ 61    Reversed and remanded.