**2020 IL 124753**


# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____


(Docket No. 124753)

THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* THE DEPARTMENT OF HUMAN RIGHTS, Appellee, v. OAKRIDGE HEALTHCARE CENTER, LLC, Appellant.


*Opinion filed September 24, 2020.*



JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Karmeier, Theis, and Michael J. Burke concurred in the judgment and opinion.

Justice Neville took no part in the decision.



**OPINION**

¶ 1     In April 2014, a judgment was entered against Oakridge Nursing & Rehabilitation Center, LLC (Oakridge Rehab), for its discriminatory conduct against a former employee, in violation of the Illinois Human Rights Act (Act) (775

ILCS 5/1-101 *et seq.* (West 2010)). Oakridge Rehab had already gone out of business, however, having transferred the assets and operation of its nursing home facility to Oakridge Healthcare Center, LLC (Oakridge Healthcare), on January 1, 2012. Unable to enforce the judgment against Oakridge Rehab, the State instituted proceedings to enforce the Oakridge Rehab judgment against Oakridge Healthcare. Oakridge Healthcare successfully moved for summary judgment, alleging it could not be held liable for the judgment under Illinois's common-law rule. On appeal, a majority of the appellate court reversed and agreed to adopt the federal successor liability doctrine. We reverse that judgment and decline to adopt the federal successor liability doctrine in cases arising under the Act.

¶ 2                                                   I. BACKGROUND

¶ 3        In February 2011, Jane Holloway filed a charge pursuant to the Act with the Illinois Department of Human Rights (Department), alleging age and disability discrimination that violated the Act at the long-term care facility where she was previously employed by Oakridge Rehab; Oakridge Rehab received notice of the charge that spring. On January 1, 2012, Oakridge Rehab; its landlord, Oakridge Nursing and Rehab Properties, LLC (Oakridge Properties); and a newly formed entity, Oakridge Healthcare, entered into a termination agreement ending the lease between Oakridge Rehab and Oakridge Properties and making Oakridge Healthcare the new lessee. On the same date, Oakridge Rehab transferred substantially all its corporate assets to Oakridge Healthcare pursuant to an "Operations Transfer Agreement" that also declared Oakridge Healthcare was not a successor or successor-in-interest to the transferor and that Oakridge Healthcare was neither liable for the transferor's obligations nor subject to any judgment for its liabilities. Oakridge Rehab then immediately ceased operations, and Oakridge Healthcare took over the nursing home under a new name. After concluding its investigation into Holloway's allegations, the Department filed a civil rights complaint on her behalf with the Illinois Human Rights Commission (Commission) in September 2012. The complaint sought relief against only Oakridge Rehab and included no claim asserting personal liability.

¶ 4        On September 17, 2013, an administrative law judge issued a recommendation that Holloway be awarded $30,880 in back pay, plus prejudgment interest. The

Commission adopted the recommended order in April 2014 and granted a motion seeking to enforce the order against Oakridge Rehab, the sole respondent, a few months later. Oakridge Rehab, however, was involuntarily dissolved in November 2014. When Oakridge Rehab failed to satisfy Holloway's judgment, the State of Illinois filed a complaint in the circuit court of Cook County against both Oakridge Rehab and Oakridge Healthcare, its purported successor, to enforce compliance, but again no personal liability claim was made.

¶ 5      Oakridge Healthcare filed a motion for summary judgment, arguing that it could not be held liable for Oakridge Rehab's liabilities as a matter of law under the common-law doctrine of corporate successor nonliability when no exception to that general rule applied. After the State asserted its inability to respond in the absence of any discovery, discovery commenced.

¶ 6      The State deposed Helen Lacek, who was a member of Oakridge Rehab as well as its manager prior to the transfer of its operations to Oakridge Healthcare. Helen testified that Oakridge Rehab began experiencing dire financial trouble when the State of Illinois stopped making payments on invoices. Oakridge Rehab's financial problems quickly escalated until it was no longer able to pay its rent. In June 2011, Oakridge Rehab provided the required six-month notice to its landlord, Oakridge Properties, stating its intent to terminate the lease due to its financial difficulties. While several people visited Oakridge Rehab prior to its transfer to Oakridge Healthcare, none of them expressed any interest in taking over the facility operations.

¶ 7      The State also deposed Oakridge Properties manager Elisha Atkin (Eli), who founded Oakridge Healthcare in November or December 2011. Eli is a 50% member of Oakridge Healthcare, with the other 50% member being his sister-in-law. Eli is also involved as a member or manager in a number of other long-term care facilities or properties, along with several of his immediate and extended family members. One of those facilities is McAllister Properties, LLC, whose members are Eli's wife, his brother, Helen Lacek, and Ability Insurance; Eli manages that business. Helen and Eli were also two of the members of McAllister Nursing and Rehab Center, LLC (McAllister Rehab), another long-term care facility. Helen serves as the administrator of McAllister Rehab and has also been a

nursing consultant at some of the other facilities connected to Eli, but she has not provided those services at Oakridge Healthcare.

¶ 8 Eli stated that negotiations about Oakridge Healthcare becoming the new lessee of the nursing home facility began in November 2011. Its new lease started on January 1, 2012, when the lease between Oakridge Properties and Oakridge Rehab ended. Oakridge Rehab did not notify Oakridge Healthcare of any pending claims filed by past or present employees prior to the transfer of the nursing home operation. In addition, Oakridge Healthcare did not look at any of Oakridge Rehab's liabilities prior to the transfer because it was not assuming any of them under the terms of the transfer agreement.

¶ 9 In its response to Oakridge Healthcare's motion for summary judgment, the State contended that the court should apply the federal doctrine of successor liability instead of the Illinois general nonliability rule in this case. The State argued that the federal doctrine should be applicable because this case involved employment discrimination and "Illinois courts look to standards applied to federal claims brought under federal employment discrimination laws in analyzing" cases alleging violations of the Act. 2019 IL App (1st) 170806, ¶ 20. Before it entered summary judgment in favor of Oakridge Healthcare, the trial court made several findings, concluding that (1) Oakridge Healthcare was not a successor in liability to Oakridge Rehab, (2) the State did not show that Oakridge Healthcare was a mere continuation of Oakridge Rehab, and (3) Illinois's long reliance on the common-law successor nonliability rule precluded adoption of the federal successor liability doctrine.

¶ 10 The State appealed, and the appellate court reversed, remanding the cause for further proceedings. A majority of the court found that "the State presented sufficient evidence for a reasonable trier of fact to find that the asset transfer was for the fraudulent purpose of escaping Holloway's judgment." 2019 IL App (1st) 170806, ¶ 42. The majority cited evidence that Holloway's discrimination charge was filed before the transfer and Oakridge Rehab transferred nearly all the corporation's assets to Oakridge Healthcare without an appraisal or payment, leaving it unable to pay Holloway's subsequent judgment. 2019 IL App (1st) 170806, ¶¶ 35-38. The appellate majority also held it could apply the federal successor liability doctrine to cases involving violations of the Act because this

- 4 -

court "has not specifically addressed a successor corporation's liability for employment discrimination." 2019 IL App (1st) 170806, ¶ 51. Applying the version of the federal successor liability test from *Equal Employment Opportunity Comm'n v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974), later articulated in *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750-53 (7th Cir. 1985), the appellate majority found a number of relevant factors were met here. First, Oakridge Rehab and Helen Lacek knew about Holloway's claim before the assets transfer. Second, Oakridge was "unable to provide Holloway relief" due to its serious financial troubles. Third, Oakridge Healthcare continued to operate the facility as a nursing home after the asset transfer by "using the same workforce and at the same location," showing a continuity of business. For those reasons, the appellate court concluded that "Holloway's judgment may be imposed on Oakridge Healthcare as Oakridge [Rehab's] successor" under the federal doctrine. 2019 IL App (1st) 170806, ¶ 58.

¶ 11        Dissenting from the majority's reasoning, Justice Mason asserted that its reliance on the fraudulent transfer exception was improper because the record showed the State abandoned that claim when it made the "strategic decision" to "unequivocal[ly] disavow[ ]" any trial argument on it. 2019 IL App (1st) 170806, ¶ 74 (Mason, J., dissenting). Even if the merits of the argument were considered, the majority's conclusion was unsupported because the State offered "no evidence" that Oakridge Rehab's pretransfer financial problems were "contrived." In the dissent's view, Oakridge Rehab's "only viable choice was to conduct a 'fire sale' of its assets, which it did" due to serious financial distress. The dissent found "no 'badge of fraud' in this scenario." 2019 IL App (1st) 170806, ¶ 85.

¶ 12        In addition, the dissent explained that the majority's application of the federal successor liability doctrine in cases addressing Act violations conflicts with long-standing Illinois precedent, including this court's decision in *Vernon v. Schuster*, 179 Ill. 2d 338, 344-45 (1997). There, the dissent noted, we recognized only four exceptions to the common-law rule of successor nonliability, contrary to the federal doctrine. 2019 IL App (1st) 170806, ¶¶ 68, 80. As evidence of the majority's overreach, the dissent cited a heading in the majority opinion that read " 'Illinois Courts Shall Recognize Successor Liability for Violation of the Illinois Rights Act.' " 2019 IL App (1st) 170806, ¶ 80 (quoting 2019 IL App (1st) 170806, ¶ 49 (majority opinion)). According to the dissent, "the majority modifie[d] *Vernon* by

creating a new exception to be applied in employment discrimination cases," an act that "is beyond [the appellate court's] power as an intermediate court of review." 2019 IL App (1st) 170806, ¶ 80.

¶ 13   Oakridge Healthcare filed a petition for leave to appeal in this court. We allowed its petition pursuant to Illinois Supreme Court Rule 315 (eff. July 1, 2018).

¶ 14                                    II. ANALYSIS

¶ 15   We are asked to decide two issues in this appeal: (1) whether we should adopt the federal corporate successor liability doctrine in cases involving discriminatory conduct that violates the Act (775 ILCS 5/1-101 *et seq.* (West 2010)) and (2) whether the trial court properly granted Oakridge Healthcare's motion for summary judgment. We review both issues *de novo*. *Blount v. Stroud*, 232 Ill. 2d 302, 308 (2009) (stating that questions of law are reviewed *de novo*); *Seymour v. Collins*, 2015 IL 118432, ¶ 42 (stating that rulings on motions for summary judgment are reviewed *de novo*).

¶ 16                A. Applicability of the Common-Law Nonliability Rule

¶ 17   Because the resolution of whether we should adopt the federal corporate successor liability doctrine in cases where the underlying conduct violates the Act directs the rest of our analysis, we address it first. In *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964), the United States Supreme Court invoked federal Labor Management Relations Act (Labor Act) (29 U.S.C. § 185 (1958)) principles to support its application of the corporate successor liability doctrine. The Court held that the successor company in a corporate merger could be bound by the arbitration provisions in its predecessor's collective bargaining agreement because it was enforceable under the Labor Act. *John Wiley*, 376 U.S. at 550.

¶ 18   Use of the successor liability doctrine in federal labor law cases was further developed in *Golden State Bottling Co. v. National Labor Relations Board*, 414 U.S. 168 (1973). There, the Court agreed with the National Labor Relations Board that a corporate successor that bought and continued another business, without substantial change and with notice of its predecessor's National Labor Relations

Act violations, was required to follow the terms of labor board orders entered to remedy those violations. *Golden State*, 414 U.S. at 171-72. The Court explained that the additional liability risk taken on by the successor corporation could be fairly accommodated during negotiations on the business's purchase price or by the insertion of an indemnity clause into the sales agreement that protected the buyer. *Golden State*, 414 U.S. at 185.

¶ 19    Federal appellate courts subsequently expanded the federal successor liability doctrine to employment discrimination cases filed under Title VII. In *MacMillan Bloedel Containers, Inc.*, 503 F.2d at 1090, the Sixth Circuit held the Supreme Court's rationale applied equally to cases involving unfair employment practices and that successor liability should be determined on a case-by-case basis. To aid in the inquiry, the Sixth Circuit identified nine factors: (1) whether the successor company had notice of the alleged violation; (2) the predecessor's ability to provide relief; (3) whether the two businesses had a "substantial continuity" of operations; (4) whether the new company uses the same facility; (5) whether it "uses the same or substantially the same work force"; (6) whether it "uses the same or substantially the same supervisory personnel"; (7) whether the jobs are the same and continue "under substantially the same working conditions"; (8) whether it uses the same equipment, machinery, and production methods; and (9) whether it produces the same product. *MacMillan Bloedel Containers, Inc.*, 503 F.2d at 1094. The Seventh Circuit, in turn, narrowed the analysis down to just five factors: whether (1) the transferee had notice of the legal challenge; (2) the transferor could have given the requested relief before the sale or dissolution; (3) the transferor could have given the requested relief after the sale or dissolution; (4) the transferee can give the requested relief; and (5) a continuity of operations and work force existed between the transferor and the transferee. *Equal Employment Opportunity Comm'n v. Northern Star Hospitality, Inc.*, 777 F.3d 898, 902 (7th Cir. 2015) (citing *Teed v. Thomas & Betts Power Solutions, L.L.C.*, 711 F.3d 763, 765-66 (7th Cir. 2013)).

¶ 20    Eschewing the federal doctrine, however, Illinois, along with the majority of American jurisdictions, has long applied the common-law rule that a corporate successor is not subject to any debts or obligations incurred by the entity that previously operated the business. That principle is known as the "rule of successor corporate nonliability." *Vernon*, 179 Ill. 2d at 344-45. It was " 'developed as a response to the need to protect bonafide purchasers from unassumed liability'

(*Tucker v. Paxson Machine Co.*, 645 F.2d 620, 623 (8th Cir. 1981)) and was 'designed to maximize the fluidity of corporate assets' (*Upholsterers' International Union Pension Fund v. Artistic Furniture*, 920 F.2d 1323, 1325 (7th Cir. 1990))." *Vernon*, 179 Ill. 2d at 345. Recognizing that the rule's application may preclude a plaintiff from receiving court-ordered relief if the original business is dissolved or lacks sufficient assets, this court adopted four exceptions: (1) the parties had an express or implied agreement that the transferee would assume the transferor's liabilities, (2) the transaction amounts to a merger or consolidation or a *de facto* merger of the transferor and the transferee, (3) the transferee is a mere continuation or reincarnation of the transferor, or (4) the transaction was entered into for the fraudulent purpose of avoiding liability for the transferor's obligations. Most American courts have also recognized the same four exceptions. *Vernon*, 179 Ill. 2d at 345.

¶ 21         Nonetheless, the State asserts that those exceptions are inadequate to serve the important interests underlying the Act's antidiscrimination provisions. It suggests, instead, that we adopt the federal successor liability doctrine in cases arising out of the Act because it permits the relevant interests to be balanced on a case-by-case basis. Individualized balancing, however, necessarily undercuts the concern underlying the creation of our current common-law nonliability rule: imposing successor liability harms *bona fide* corporate buyers by creating undue uncertainty. In the more than two decades since we decided *Vernon*, *bona fide* corporate buyers in Illinois have undoubtedly come to rely on that rule. Any shift away from our long-standing rule must be supported by special justification sufficient to excuse the harm that will necessarily flow to the many successor businesses that have relied on it. See *Coleman v. East Joliet Fire Protection District*, 2016 IL 117952, ¶ 53 (quoting our explanation in *People v. Sharpe*, 216 Ill. 2d 481, 520 (2005), that " 'we have consistently held that any departure from *stare decisis* must be specially justified' " (quoting *Vitro v. Mihelcic*, 209 Ill. 2d 76, 82 (2004))). We may not depart from *stare decisis* simply because we could possibly reach a different conclusion now if we were to decide the matter anew. To be consistent with the principle of *stare decisis*, overturning the common-law rule we adopted in *Vernon* requires a clear showing of good cause or some other compelling rationale. See *Coleman*, 2016 IL 117952, ¶ 53 (citing *Sharpe*, 216 Ill. 2d at 520).

¶ 22    While not disputing those standards, the State contends that Oakridge Healthcare provides no persuasive reason not to adopt the federal successor liability doctrine. That contention, however, ignores the undeniable fact that this court expressly adopted the common-law nonliability rule, not the federal rule, in *Vernon*. In response, the State relies on its claim that *Vernon* does not control the instant case because it did not involve workplace discrimination. The State maintains that the federal doctrine is better suited for use in cases involving Act violations because it arose out of labor law, a context that is more similar to the employment discrimination claim underlying this litigation.

¶ 23    Although it is true that the Court's decision in *John Wiley*, 376 U.S. 543, held the corporate successor liability doctrine could bind the successor company in the corporate merger to the arbitration provisions, that decision had two critical considerations missing from the instant appeal. First, the Court in *John Wiley* explicitly recognized that the predecessor and successor companies had entered into a corporate merger. Here, the State does not attempt to claim that Oakridge Healthcare and Oakridge Rehab merged operations such that both continued to exist as a single, newly established legal entity. In fact, the State's argument relies extensively on Oakridge Rehab's continuing existence as a separate entity after Oakridge Healthcare took over the nursing home business. Indeed, it was Oakridge Rehab's independent inability to pay the judgment entered against it due to its financial failure and ultimate dissolution that led to the State filing the instant action against its successor, Oakridge Healthcare. Here, the predecessor and successor corporations have absolutely no continuing relationship, while in *John Wiley* the two corporations merged to become a single entity. The vastly more attenuated relationship between Oakridge Rehab and Oakridge Healthcare does not, by itself, justify the application of the federal rule used in *John Wiley*. Indeed, if Oakridge Rehab and Oakridge Healthcare had entered into a corporate merger, the successor entity would, in fact, have been subject to liability under the second exception to our common-law rule of general successor nonliability stated in *Vernon*. The second *Vernon* exception allows for the imposition of liability "where the transaction amounts to a consolidation or merger of the purchaser or seller corporation." *Vernon*, 179 Ill. 2d at 345. The availability of that exception provides a sufficient basis to reject the State's suggestion that this court apply the rule from *John Wiley* since that exception is inapplicable under the facts of this case.

¶ 24    We note, however, that another rationale also exists for rejecting the State's assertion that the federal rule is better suited to cases involving Act violations than the *Vernon* rule. In *John Wiley*, the Supreme Court relied heavily on the distinctive considerations underlying the federal Labor Act's handling of collective bargaining agreements—considerations that are wholly inapplicable here. As *John Wiley* explained, the Court's decision was based on the "impressive [national labor] policy considerations favoring arbitration" (*John Wiley*, 376 U.S. at 550), a subject that is irrelevant here. Even more critically, the Court expressly recognized the unique policies at stake in collective bargaining agreements that significantly differentiate them from ordinary contracts.

> "*The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses* and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship. \*\*\*

> \*\*\* *While the principles of law governing ordinary contracts would not bind to a contract an unconsenting successor to a contracting party, a collective bargaining agreement is not an ordinary contract.* '. . . [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. . . . *The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry* or of a particular plant.' *Warrior & Gulf*, [363 U.S.] at 578-579 \*\*\*." (Emphases added.) *John Wiley*, 376 U.S. at 549-50.

¶ 25    None of those same distinctive considerations are at issue here, however, further undermining the State's claim that the federal doctrine is better suited to resolve the instant case than is *Vernon*. We are not persuaded that the State's argument provides a sufficiently clear showing of good cause or other compelling rationale to merit overturning our adoption of the successor corporate nonliability doctrine as it was adopted in *Vernon*.

¶ 26    To bolster its argument that this court should reject our common-law doctrine and adopt the federal one, the State contends that, if Illinois fails to adopt the federal successor liability doctrine, the outcome in factually similar cases could depend on whether the case was filed in state or federal court. For example, a case involving

an Act violation filed in Illinois could result in the corporate defendant being absolved of any liability while a factually similar case alleging a federal violation that was filed in federal court could produce a substantial judgment for the complainant. The State asserts that the difference in outcomes based on whether the court applied the Illinois common-law rule or the federal doctrine is not consistent with state and federal courts possessing overlapping jurisdiction over employment discrimination claims.

¶ 27       The potential for differences in outcomes between similar federal and state employment discrimination cases falls far short of providing a compelling reason to abandon the *Vernon* standard for the federal doctrine. The two systems have many distinctive features that can affect the outcome of a case aside from the use of differing standards for imposing liability on a corporate successor. As we have discussed, the federal doctrine is deeply rooted in the unique underpinnings of federal labor law and collective bargaining policies, while our common-law doctrine has far broader base considerations. We, along with the vast majority of other states, have weighed the relevant factors and determined that the four exceptions to the successor nonliability rule are sufficient to provide a safety valve for unjust uses of the rule in appropriate cases. *Vernon*, 179 Ill. 2d at 345. The mere possibility that a particular employment discrimination case could have a different outcome if brought in federal court is not sufficiently compelling to overturn our decades-old common-law rule.

¶ 28       The State next asserts that several states with antidiscrimination statutes similar to the Illinois Act have also adopted the federal formulation. See *In re MTA Trading, Inc.*, 922 N.Y.S.2d 488, 491-92 (App. Div. 2011); *Stevens v. McLouth Steel Products Corp.*, 446 N.W.2d 95, 100 (Mich. 1989); *First Judicial District Department of Correctional Services v. Iowa Civil Rights Comm'n*, 315 N.W.2d 83, 89-92 (Iowa 1982); *Superior Care Facilities v. Workers' Compensation Appeals Board*, 32 Cal. Rptr. 2d 918, 924-25 & n.1 (Ct. App. 1994). While acknowledging that Illinois courts are not bound by decisions of other courts, the State argues that the reasoning in foreign decisions can be persuasive. It contends that, at most, adoption of the federal successor liability doctrine in cases arising out of the Act requires potential buyers to conduct due diligence before purchasing another company's assets, a task already ordinarily undertaken by prudent businesspersons.

¶ 29　　By choosing to apply the federal standard, the few states that have adopted the federal doctrine have weighed the policy considerations underlying the competing interests of purchasing corporations and victims of employment discrimination and decided on a balance that is at odds with the majority of American jurisdictions continuing to adhere to the common-law rule. See *Vernon*, 179 Ill. 2d at 345 (explaining the extensive case law basis for the common-law rule and its application in American courts). In *Vernon*, 179 Ill. 2d at 345, this court expressly adopted the majority approach, acknowledging the value of the need to make marginal and failing companies marketable and prevent them from closing their doors forever. While conducting due diligence before purchasing corporate assets is certainly a commonplace and well-advised procedure, it cannot always provide a solid basis to assess the value of the predecessor corporation's future liability accurately when the underlying Act litigation is in its early stages, years before the entry of a final judgment award, as in this case. In those instances and many others, application of the federal rule would severely undercut *Vernon*'s concerns about promoting the salability of marginal businesses to avoid the loss of jobs, community resources, and revenues that result when a business is shuttered.

¶ 30　　Nonetheless, recognizing the possible inequities that may result from the common-law rule's application in certain cases, most jurisdictions, including this one, have adopted four limited exceptions to the general rule of nonliability for corporate successors. In its decision, however, the appellate majority created a fifth exception that applies solely to cases involving employment discrimination claims brought under the Act. The addition of that exception constitutes a significant modification of this court's decision in *Vernon*, 179 Ill. 2d at 345, where we expressly limited, and listed, four exceptions. As this court has repeatedly admonished, our appellate court may not overrule or change our holdings. " ' "Where the Supreme Court has declared the law on any point, *it alone can overrule and modify its previous opinion*, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decision in similar cases." ' " (Emphasis in original.) *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 28 (quoting *Price v. Philip Morris*, Inc., 2015 IL 117687, ¶ 38, quoting *Agricultural Transportation Ass'n v. Carpentier*, 2 Ill. 2d 19, 27 (1953)).

¶ 31　　Acknowledging that fundamental point, as it must, the State is left to argue that the appellate court's addition of a fifth exception did not actually modify our

opinion in *Vernon* because *Vernon* did not rise out of an Act violation and the federal doctrine better suits that context. Essentially, the State asserts that the application of the common-law rule remained an open question after *Vernon* was decided because it did not specifically address the rule to be applied in cases addressing violations of the Act. Our discussion in *Vernon*, however, was quite broad. It was not limited to the narrow context of warranty and contract liability incurred by successive sole proprietorships, the relevant facts in that decision. As we have already noted, important underlying considerations distinguish the application of the federal liability doctrine, deeply rooted in federal labor law, and our common-law nonliability rule, stemming from broader policy considerations.

¶ 32       Indeed, a review of Illinois case law shows that the common-law nonliability rule has been applied in the context of a wide variety of legal claims, not just those involving labor law issues. In *Vernon*, 179 Ill. 2d at 343, the underlying action involved allegations of breach of warranty and contract, and our appellate court has applied the common-law rule broadly in many other types of underlying actions. See, *e.g.*, *A.L. Dougherty Real Estate Management Co. v. Su Chin Tsai*, 2017 IL App (1st) 161949 (involving the breach of a commercial lease); *Groves of Palatine Condominium Ass'n v. Walsh Construction Co.*, 2017 IL App (1st) 161036 (involving defects in the construction of condominium buildings); *Advocate Financial Group, LLC v. 5434 North Winthrop, LLC*, 2015 IL App (2d) 150144 (involving payment for financial services); *Villaverde v. IP Acquisition VIII, LLC*, 2015 IL App (1st) 143187 (involving nonpayment of wages); *Diguilio v. Goss International Corp.*, 389 Ill. App. 3d 1052 (2009) (involving a product liability claim). Although the State contends that the appellate court did not modify the rule in *Vernon* because the scope of its application remained an open question, the breadth of the rule's prior application seriously undermines that contention. We hold that the appellate majority erred by altering this court's enunciation of that rule by adding a fifth exception.

¶ 33       Finally, we note that it is within the legislature's power to abrogate the common-law rule we adopted in *Vernon* or otherwise alter its standards through appropriately targeted legislation if it determined those changes to the rule and its exceptions necessary in a specific context, such as employment discrimination cases. To date, our legislature has not chosen to do so. We stand by *Vernon*'s adoption of the common-law rule of successor corporate nonliability and its four

- 13 -

exceptions because the State has failed to show good cause or other compelling reason to reject its application in cases involving Act violations.

¶ 34                    B. Application of the "Fraudulent Purpose" Exception

¶ 35    Having decided not to adopt the federal successor corporate liability rule in Act cases, we next examine whether the "fraudulent purpose" exception to our common-law rule of nonliability applies under the facts of this case. Oakridge Healthcare argues that the appellate majority erred by concluding that the "fraudulent purpose" exception applied to its acquisition of Oakridge Rehab's long-term care facility. The fraudulent purpose exception exists "where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations." *Vernon*, 179 Ill. 2d at 345. Initially, Oakridge Healthcare claims that the State forfeited this argument by failing to raise it in the trial court, to oppose Oakridge Healthcare's summary judgment motion for summary judgment, or as a theory of recovery in its complaint.

¶ 36    Before the appellate court, the State claimed that court could affirm or reverse on any ground appearing in the record. That claim reflects a misunderstanding of the applicable standard. A reviewing court *may only affirm* on any basis in the record; it may not reverse on any grounds found in the record. See *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 258 (2006). Nonetheless, in this instance we will overlook any forfeiture of the fraudulent purpose exception and address the merits of the State's claim because the appellate majority relied on it to reverse the summary judgment finding entered in favor of Oakridge Healthcare. Forfeiture is an admonition to the parties, not a limitation on a reviewing court's jurisdiction. We may ignore forfeiture "in the interests of achieving a just result and maintaining a sound and uniform body of precedent." *Jackson v. Board of Election Commissioners of the City of Chicago*, 2012 IL 111928, ¶ 33.

¶ 37    In Illinois, sections 5 and 6 of the Uniform Fraudulent Transfer Act (Fraud Act) (740 ILCS 160/5, 6 (West 2018)) recognize two types of fraud: fraud in fact and fraud in law (*Bank of America v. WS Management, Inc.*, 2015 IL App (1st) 132551, ¶ 87). As both parties acknowledge, fraud in fact requires proof that the "debtor" (here, Oakridge Rehab) had an "actual intent to hinder, delay, or defraud any creditor of the debtor" (here, Holloway/the State). 740 ILCS 160/5(a)(1) (West

2018). Without proof of the debtor's "actual intent to hinder, delay, or defraud any" of its creditors, fraud in fact cannot be established. 740 ILCS 160/5(a)(1) (West 2018). To create an inference of the requisite intent, the State must seek to prove the factors listed in section 5(b) of the Fraud Act (740 ILCS 160/5(b) (West 2018)). *Premier Property Management, Inc. v. Chavez*, 191 Ill. 2d 101, 110 (2000) (noting that section 5(b) "lists 11 factors that may be considered in determining the debtor's actual intent in making the transfer"). Those factors have sometimes been deemed "badges of fraud." *Bank of America*, 2015 IL App (1st) 132551, ¶ 88. Courts are not constrained by that list, however, and need not consider every factor. In addition, they may consider other factors not enumerated in section 5(b). The presence of one or more factors, however, is not conclusive evidence of fraud. *Bank of America*, 2015 IL App (1st) 132551, ¶¶ 88-89. The factors expressly set out in section 5(b) are whether:

"(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." 740 ILCS 160/5(b) (West 2018).

See *Bank of America*, 2015 IL App (1st) 132551, ¶ 88.

¶ 38    Before this court, the State asserts that "a reasonable fact finder would determine that the transfer met several 'badges' of fraud." Consistent with the appellate majority's analysis, the State argues that the evidence sufficiently established the fourth, fifth, eighth, and ninth factors to preclude the entry of summary judgment for Oakridge Healthcare. Because the State does not present any argument addressing the other statutory indicia of fraud, we will address only those four factors.

¶ 39    The fourth factor considers whether, "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit." 740 ILCS 160/5(b)(4) (West 2018). Holloway filed her discrimination charge against Oakridge Rehab in February 2011, and Oakridge Rehab was notified of that charge in the spring of that year. On January 1, 2012, Oakridge Rehab transferred virtually all business assets to Oakridge Healthcare. Undoubtedly, Oakridge Rehab was aware of Holloway's charge at the time of the transfer. That does not mean, however, that the fourth factor was even arguably established. The filing of a charge with the Department does not inexorably lead to the filing of a lawsuit. Indeed, no complaint was filed in this case until September 2012, at least eight months after the transfer, when the Department concluded its investigation. It cannot legitimately be said that Oakridge Rehab was "threatened with suit" at the time that the transfer occurred. The Department's investigation was underway, and at that point neither party could reasonably foresee the outcome of that investigation. We conclude the evidence does not support the presence of the fourth factor.

¶ 40    Moving to the fifth factor, we examine whether "the transfer was of substantially all the debtor's assets." 740 ILCS 160/5(b)(5) (West 2018). Oakridge Healthcare acknowledges that the record contains sufficient evidence to show it received "substantially all" assets owned by Oakridge Rehab, with the latter keeping only its accounts receivable, consisting largely of moneys still owed to it by the State. While a single factor may, on occasion and under the appropriate circumstances, be sufficient to create an inference of fraud in fact, those

- 16 -

circumstances are not present here. See *Brandon v. Anesthesia & Pain Management Associates, Ltd.*, 419 F.3d 594, 600 (7th Cir. 2005). It is, in fact, difficult to imagine when the mere transfer of substantially all corporate assets, standing alone, would be sufficient to justify an inference of fraud in fact. Many, if not most, corporate transfers presumably include the transfer of substantially all corporate assets since they typically constitute a significant portion of the business's value and are critical to its operations. Here, Oakridge transferred assets, other than real property, that were needed to care for the facility's residents. Transferring those assets allowed for the continuous care of the residents and is not, by itself, a sufficient justification to infer fraud in fact.

¶ 41    In considering evidence of the eighth factor, we examine whether "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." 740 ILCS 160/5(b)(8) (West 2018). Of all the factors it cites, the State focuses most heavily on this one. In a related argument, it contends that the parties' failure to obtain an appraisal of the asserts prior to the transfer adds support to its position.

¶ 42    The State points to evidence that, after Holloway filed her charge, Oakridge Rehab transferred nearly all business assets to Oakridge Healthcare without any negotiations or consideration in a transaction that was not made at arm's length. As additional support for the inference of fraud, the State notes that Helen Lacek and Eli Atkin, along with his other family members, were close business associates for decades, that Oakridge Healthcare was founded specifically to acquire Oakridge Rehab's assets, and that the assets' value was unknown because they had not been appraised. In addition, Helen and Eli continued to have a close business relationship after the transfer, with Helen serving as a consultant for three companies affiliated with Eli and both Helen and Eli sharing connections to two other companies. The State maintains that, based on these facts, a reasonable fact finder could find that Helen used the transfer to avoid any potential liability to Holloway.

¶ 43    Although Helen and Eli were admittedly well acquainted with each other after years of working in the same industry, that does not create a reasonable inference that the asset transfer was not an arm's-length transaction. In industries with fewer players in a particular region, such as the residential care industry, it is not surprising that Helen and Eli would both have connections to some of the same

business entities. Taken alone, those business connections do not create any nefarious inferences.

¶ 44    Under the unique facts of this case, the lack of any monetary exchange when the assets were transferred also does not imply the transaction was structured to avoid liability. Oakridge Rehab was in serious financial distress due to the State's ongoing failure to make its Medicaid payments. Oakridge Rehab chose to continue operations as long as possible, likely in the hope that those payments would be made before it had to close its doors. To continue caring for its residents, Oakridge chose to use its limited funds to pay staff instead of rent, but it recognized that situation could not continue indefinitely. Despite evidence that a few other businesses inquired about the possibility of buying Oakridge Rehab, those inquiries did not lead to purchase offers. Oakridge Healthcare was the only entity that expressed any serious interest in the facility. While no monetary consideration was exchanged in the transfer, Oakridge Rehab obtained a distinct benefit: it was no longer liable for the operation's escalating expenses and retained its accounts receivable, including the Medicaid sums due from the State. Those future payments could then be used to pay back rent and early lease termination penalties totaling more than $454,000, along with any other unpaid bills. In other words, the transfer allowed Oakridge Rehab to stop the bleeding that was rapidly draining the company's financial lifeblood.

¶ 45    And, while an asset appraisal may have been warranted under normal business circumstances, we cannot say that the lack of an appraisal creates a reasonable inference of an intent to defraud creditors in light of the serious financial stress and limited sale opportunities for Oakridge Rehab. The assets that were transferred to Oakridge Healthcare consisted of the license needed to operate the facility, beds, three days' worth of perishable food, a week's worth of frozen food, stock medicines, medical supplies, and some paper. Because Oakridge Rehab did not own the physical building used for its operations, the building was not an asset that could have been transferred, with possession of it reverting to Oakridge Properties when the lease was terminated. We conclude that, under these circumstances, the absence of an asset appraisal and outright monetary payment was insufficient to establish the eighth indicator of fraudulent intent.

¶ 46    Finally, the ninth factor requires this court to review whether "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred." 740 ILCS 160/5(b)(9) (West 2018). The transfer occurred on January 1, 2012. Although the appellate court and the State focused on Oakridge Rehab's financial problems prior to the transfer, their supporting evidence is minimal. The appellate majority relied solely on Helen Lacek's deposition statement that Oakridge Rehab began having financial troubles in June 2011 and that those troubles escalated until it could not pay its rent, requiring the early termination of its lease. The State's brief offers even less support, perfunctorily asserting only that Oakridge Rehab "was insolvent before the asset transfer was made (badge 9)."

¶ 47    We are not persuaded that the evidence sufficiently establishes Oakridge Rehab's insolvency at or shortly after the time of the transfer. Certainly, it was undergoing serious financial distress that would likely not have been resolved until the State resumed making the payments it rightfully owed. At the time of the transfer, however, Oakridge Rehab was still paying its staff and otherwise maintaining its operations, albeit at the expense of paying its rent. Nonetheless, the business's financial condition would undoubtedly have brightened considerably if the State had resumed the timely payment of its obligations, a condition that did not occur prior to the transfer.

¶ 48    Assuming *arguendo* that Oakridge Rehab was insolvent at the time of the transfer, we cannot say that the presence of only two indicators of potential fraud, numbers five (a transfer of substantially all assets) and nine (insolvency at the time of the transfer), is sufficient to preclude the entry of summary judgment under the facts of this case. See 740 ILCS 160/5(b)(5), (9) (West 2018) (listing the factors relevant here). Even if all 11 factors are present, they may be insufficient to create an inference or presumption of fraud in fact. *A.G. Cullen Construction, Inc. v. Burnham Partners, LLC*, 2015 IL App (1st) 122538, ¶ 29. One of the touchstones of the Fraud Act is whether the transfer was made with "actual intent to hinder, delay, or defraud" a creditor, a requirement expressly stated in section 5(a)(1). 740 ILCS 160/5(a)(1) (West 2006). If the circumstances surrounding a transfer do not establish it was made with the actual intent to avoid a creditor, the evidence is insufficient to prove the fraud. *Bank of America*, 2015 IL App (1st) 132551, ¶ 79.

¶ 49 Here, the State has shown only that Oakridge transferred substantially all corporate assets at a time when it was at least arguably insolvent. That, without more, is legally insufficient to show it had an actual intent to avoid its creditors at the time the transfer occurred. As Oakridge Healthcare notes, Oakridge Rehab had serious financial problems stemming from the State's failure to make its requisite payments for the care of the facility's residents. Without enough money coming in to pay all its ongoing bills, Oakridge Rehab opted to pay its staff and forgo its rental payments. As the State grew further and further behind in its payments, Oakridge Rehab's financial position became more dire until it was forced to terminate its lease. If it had not transferred virtually all remaining assets to Oakridge Healthcare at that point, it would have had to close, forcing the elderly and disabled residents in its care to find other accommodations or risk becoming homeless. Those circumstances do not support the conclusion that Oakridge Rehab was motivated to transfer its assets by an intent to evade its financial obligations to Holloway.

¶ 50 That conclusion is further bolstered by the fact that, at the time of the transfer on January 1, 2012, the Department had not even completed its investigation of Holloway's allegations. Its investigation was not finished until shortly before it filed its complaint against Oakridge Rehab in September 2012, almost eight months after the transfer took place. Even after that filing, the outcome of the proceeding was not assured. At the time of the asset transfer, it was pure speculation that the Department would decide to pursue Holloway's claim before the Illinois Human Rights Commission. Thus, it would have required even greater prescience to conclude at the time of the transfer in January 2012 that the administrative law judge hearing the claim would recommend an award of $30,880 in back pay, plus prejudgment interest, and that the Commission would formally adopt the award in April 2014, more than two years after Oakridge Rehab transferred the assets. In light of those circumstances, the State has not created a question of material fact about whether Oakridge Rehab had the actual intent to evade or otherwise defraud either Holloway or the State at the time of the transfer, the necessary prerequisites for fraud in fact.

¶ 51 The State next argues that the transfer constituted fraud in law. The test for fraud in law is closely related to the requirements needed to establish the eighth factor in the State's fraud-in-fact claim. The eighth factor looks at whether "the value of the consideration received by the debtor was reasonably equivalent to the

value of the asset transferred or the amount of the obligation incurred." 740 ILCS 160/5(b)(8) (West 2018). Similarly, under the fraud-in-law standard, if the " 'transfer is made for no or inadequate consideration, *** the fraud is presumed.' " *Bank of America*, 2015 IL App (1st) 132551, ¶ 87 (quoting *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 18). The latter test is drawn from section 5(a)(2) of the Fraud Act (740 ILCS 160/5(a)(2) (West 2018)). Both tests evaluate the sufficiency of the consideration underlying the transfer. Because we previously determined that the requirements of the eighth factor of the fraud-in-fact analysis were not sufficiently met here to create a question of material fact, we need not examine the State's fraud-in-law claim further. We conclude that the trial court properly entered summary judgment for Oakridge Healthcare, and the appellate court erred by reversing that judgment.

¶ 52                                        III. CONCLUSION

¶ 53        For the reasons stated, we decline to adopt the federal successor liability doctrine in cases when a judgment has been entered for a violation of the Illinois Human Rights Act and, instead, adhere to this state's long-standing common-law rule of corporate successor nonliability, subject to only the four exceptions we recognized in *Vernon*, 179 Ill. 2d at 344-45. The Illinois Human Rights Commission's judgment in favor of Jane Holloway was entered solely against Oakridge Rehab, and the pleadings did not request relief from any other individual or entity. After analyzing the facts of this case under our common-law corporate successor nonliability rule, we conclude that Oakridge Healthcare did not incur any liability for fulfilling the judgment entered against Oakridge Rehab. Therefore, we reverse the appellate court judgment and affirm the trial court's entry of summary judgment for Oakridge Healthcare.

¶ 54        Appellate court judgment reversed.

¶ 55        Circuit court judgment affirmed.

¶ 56        JUSTICE NEVILLE took no part in the consideration or decision of this case.