2023 IL App (1st) 211652-U

SECOND DIVISION
September 12, 2023

No. 1-21-1652

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* ESTATE OF NORA KORNESCZUK | ) | |
| | ) | |
| (Eugene Kornesczuk, Plenary Guardian of the Estate of Nora Kornesczuk, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Petitioner-Appellee, | ) ) | 2016 P 8084 |
| v. | ) ) | |
| | ) | Honorable |
| James Kornesczuk, | ) ) | Shauna Boliker Judge Presiding |
| Respondent-Appellant.) | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1     *Held*: Affirmed. Trial court did not err in approving guardian's request to place mother in residential facility.

¶ 2     This appeal involves a dispute between siblings over the proper care of their mother, Nora, who is in her mid-nineties. As is often true in these situations, this case is emotionally charged; there is no question that each sibling loves their mother and has her best interests at heart. The guardian here, one of Nora's sons, petitioned the court to have Nora placed in a residential care facility that houses and cares for individuals with advanced dementia. The

respondent here, another son, objected, claiming that Nora's preferences (in large part expressed in writing some eight years ago) were to remain in her home and disputing the guardian's characterization of Nora's current health status.

¶ 3    The trial court determined that Nora's current preferences could not be ascertained, given her advanced dementia, and thus the court was required to act in her best interests. The court then determined that Nora's interests were best served by a placement in a residential care facility that the guardian had chosen. We agree with the court's interpretation of the statute, and we find that the court's ultimate judgment was supported by the evidence. We thus affirm.

¶ 4                                    BACKGROUND

¶ 5    As so tragically happens to many people as they age, Nora Kornesczuk developed dementia in her eighties. Beginning in 2016, her children—James (Jim), Eugene, Roseanne, and Kathy—engaged in a protracted legal battle over who would be their mother's guardian. In April 2017, the four children entered into a settlement agreement regarding guardianship. The 2017 agreement provided, in relevant part, that Roseanne and Eugene would function as co-guardians; "Nora will remain in her home as long as she is medically and financially able to do so;" Nora would receive 24-hour in-home care; and "[u]nless done at the direction of a medical doctor because of an immediate medical need, any change in Nora's residency must be approved by a court of competent jurisdiction."

¶ 6    In 2018, Roseanne filed a petition to resign as co-guardian, as "disputes between Roseanne and Eugene have continued to persist relative to managing Nora's estate." In March 2019, the court approved Roseanne's resignation, leaving Eugene as Nora's sole guardian. In the fall of 2021, Nora's condition began to significantly worsen. On October 18, Eugene, as

guardian, placed an un-refundable deposit with a residential facility to place a one-month hold on a spot for Nora.

¶ 7    On October 26, Eugene filed an "Emergency Motion for Leave to Place Ward in a Residential Facility." The motion alleged that, over the past few months, Nora's "mental and physical conditions have deteriorated." Her "physical strength has declined. She walks shorter distances at slower speeds. In addition, her dementia is getting worse." The motion alleged that Nora's caregivers "don't attend to her social and intellectual needs. The caregivers are not capable of providing the higher level of medical attention Nora is requiring at her current state of dementia."

¶ 8    The motion stated that Nora "has had the same full-time caregiver for 3 years. She is a wonderful caregiver and Nora flourished under her care. She followed Eugene's caregiving instructions. She gives Nora the intellectual stimulation which is important for dementia patients. However, that person has taken substantial time off in the past 3 months and is reducing her caregiving to every other week or less. Nora's quality of life has declined during her absence. The alternative caregivers are not as competent given [Nora's] increased needs and do not involve her in any meaningful activities."

¶ 9    The motion claimed that a residential facility was necessary to adequately provide for her health, social, and intellectual needs. Attached to the motion was a statement from Nora's doctor, Dr. Boblick, that Nora "is a patient of mine with advanced dementia requiring 24 hour supervision and would be appropriate for a memory care facility."

¶ 10    After notice was given, the court heard the emergency motion on October 29, 2021. All four siblings attended the hearing; the two brothers were represented by counsel. Counsel for the guardian, Eugene, argued that Nora "needs people that are skilled and trained in memory care to

stimulate her, take care of her. She has round-the-clock caregivers, but they are basically—except for one, Nelly[,] they are glorified baby-sitters." Counsel argued that Nora "needs someone to take care of her 24/7 that are licensed and skilled in medical care and memory loss."

¶ 11    Nora's other son, Jim, opposed the motion. His counsel argued that Dr. Boblick's brief letter did not suffice to show that Nora was in need of a different placement. He argued that he should be given the opportunity to depose the doctor and review medical records. And he argued that there was no evidence that Nora's condition had significantly deteriorated in the past few months.

¶ 12    The court took testimony from each child. One of Nora's daughters, Kathy, testified that "I don't think there's been enough said about who's been with my mother the most and who's probably the most qualified to understand the deep decline that she's gone into this year. That would be Eugene [the guardian]. By far, he spends the most time over there and is probably more dedicated than all of us." She then testified that:

> "as a former nurse's aide working in a nursing home with dementia, I'm—I must say that mom's declining has been very, very rapid starting basically the spring. And as my sister and others have said today, she is not verbal anymore. And she does not move very much. And she has [a] very hard time comprehending simple tasks.
>
> What bothers me about her being home most is some of the caregivers speak very poor English. And mom is not capable of understanding a word they say. So she ends up just saying nothing at all. I think with more caregivers and more people around her that maybe she would flourish. It might take a couple of weeks to adjust, but I think it would be absolutely the best thing for her at this point."

¶ 13    Nora's other daughter, Roseann, testified as follows:

"I visit my mom once a week. I am there about three and a half hours at a time. We sit and visit [the] whole time. I've seen a great change in her. *** I have seen a great decline in her. She does not want to interact like she used to. I cannot get her to read the newspaper together with me. She doesn't want to talk much. She's very quiet. *** She's not taking her pills when I'm there. The caregivers have trouble with her because she'll not swallow the medication. And then you look, and she still has it in her mouth trying to chew it around. I feel like she needs more care. She needs a facility where she can get that care with a nurse helping her or the specialist to help her take medication.

She's not the same mom in the past few months. I have seen a huge decline. I'm very concerned. *** I think she needs more. I think she [sits] in a chair. She sleeps. And she just doesn't seem to interact with us at all. It's sad. It's a big change. I don't think we're premature in making this kind of decision. I can see it. I'm there every week. *** And I feel like Eugene's making a real smart decision as a guardian. Because it's not easy. I know he's wanted to keep her at home. For him to make this decision, he has seen a change in her."

¶ 14    Eugene testified to the dramatic decline Nora has suffered in the last few months. He testified that one of the caregivers, a woman named Nelly, was particularly effective in not only attending to Nora's basic needs but in engaging her—having her performing various tasks and playing games with her, including word games, to stimulate her. But Nelly had been forced to miss a good deal of time of late, as she was studying for her U.S. citizenship test, and the caregivers who performed in Nelly's stead (either on weekends or in Nelly's absence during the weekdays) were not effective. They could perform the basics—cooking, cleaning—but they did not engage Nora in any way. In his words, "they don't have the social aspects or skill that a

memory care institution can provide." They "do not give mom the attention. They can't speak English very well. I can't communicate with them very well. And basically all Nora does is sit in her chair for three, four hours straight look out the window. A lot of dementia patients do this. It's not harmful. But it's not beneficial. *** I want mom to have care all day, every day of the week."

¶ 15     Jim, the sibling opposing the motion, had a very different view of Nora's current state. Jim stated that he spent eight hours a day with her every Sunday, which included church, where she sits in the front row for Mass, takes communion, and interacts with the priests and congregants. He testified that, over the last three months, he had been spending "three days every week all day" with Nora, much of that time doing work on the house. He testified that "Mom is responsive. Mom jokes. Mom gets up on her own, goes to the bathroom," and goes up and down stairs on her own. Jim further testified:

> "She's very communicative. We have videos of her singing. And we have videos of her talking and joking. This idea that she's sitting there without—in a comatose state is completely erroneous. The doctor's report doesn't say she should be going into the facility. She is a candidate. She's always been a candidate. He's not recommending she go into the facility. He's saying she's a candidate. That's obvious. She's been a candidate from day one."

¶ 16     Jim further testified:

> "Mom has been taken care of well. And as far as Eugene's concern about Nelly, it is true she's taken off a lot of time. And I myself was upset about that. And I talked to her. We have her on video saying that she is not going to take any more time off. She will take two days every two weeks off just like she always was. And so this concern about bad

caregivers is something that it happened for a while. But they weren't bad caregivers. But I will admit they did not engage her like Nelly does. But Nelly wants to continue to be her caregiver. And Nelly is a good caregiver. And that's been acknowledged. And mom has no chance of getting COVID in this house."

¶ 17    Jim and his counsel urged the court to slow down the matter, at least to allow further investigation. The court recognized that "the only real decision here is really Nora's decision." So the court reappointed the former guardian *ad litem* (GAL) "to go out and speak to Nora." The court continued Eugene's motion until after the GAL discussed the proposed move with Nora. In setting the schedule, the court recognized that it was necessary to act quickly, as the residential facility would only hold Nora's spot until November 18.

¶ 18    The court held the continued hearing on November 8, 2023. By this time, the GAL had met with Nora. The GAL agreed with Eugene and his sisters that Nora's memory had "severely declined" since he last met with her. For example, she could not name her children or caregivers and was recalling conversations she believed happened with *her* mother the week before (though, of course, Nora's mother had long since passed). The GAL testified that he

"attempted to talk to her about moving out of the home into a placement. She wasn't really able to follow or track those conversations. So she could not provide any insight to me either way regarding the move. I attempted to ask it in several different ways. And, again, I wasn't able to get any clear indication from her either way. I don't think she really understood what I was asking her."

¶ 19    The GAL also reported that he had been to the residential facility that Eugene had proposed for a placement. After having to pass a COVID test for entry, he got a guided tour and saw a sample room. He believed that "[i]t seemed, you know, a very appropriate facility. As you

know, I visited a lot of facilities over the years. It did come across, you know, as being a possible good placement for Nora."

¶ 20    Because the GAL still had questions about Nora's condition and the logistics of the move, he was not ready to make an official recommendation. The GAL suggested that the court approve a quick updated review by Magnolia, one of the care management companies that had made the recommendation for 24-hour in-home care earlier in the proceedings. The court agreed that it was "important to have Magnolia come in and assess Nora." The court ordered that the parties "reappoint Magnolia, have Magnolia come in and assess" and authorized the GAL to continue his investigation into what was best for Nora. The court again continued the hearing.

¶ 21    On November 18, 2023, the court held the third and final hearing on this issue. By this time, the GAL had issued a written report and recommendation. The court requested that the GAL provide a short summary. The GAL reported that, while Nora's house was clean, she was appropriately dressed, and she was overall pleasant to speak with, he reiterated his belief that "her memory [was] declining." As he reported in the prior hearing, he "was not able to get any position on [*sic*] from her regarding staying at home or moving to the facility either way."

¶ 22    The GAL also followed up with the care facility and received their assessment of Nora. According to the GAL:

> "they do believe that Nora is appropriate for this—their facility. I did mention on my last court day that *** I was concerned whether Nora can transfer out of bed so that she can use the facility bathroom on her own or needed assistance because she does have one-on-one care now. I was told both by the guardian and the memory care unit that's a situation that they're familiar with, that — (Inaudible) individual's treatment plan. And they have no concerns at this point about those issues."

¶ 23    The GAL also reported that Magnolia declined to reassess Nora for two reasons. First, they did not have time to do "any fast turnarounds on any assessment." Second, Magnolia had concerns about payment. (Apparently, there had been a delay in payment when they were last involved with Nora's care.)

¶ 24    The GAL ended his summary: "You know, at this point, Judge, I see no reason why the decision of the guardians should not be followed. I have not been—I do believe that will be in Nora's best interest at this point to allow the guardian to make the move to the memory care unit as requested."

¶ 25    After argument, the court allowed Eugene to move Nora to the residential facility. In issuing its ruling, the court concluded:

"What's in the best interest of Nora is where she can get the best care. I think Eugene has been doing a tremendous job, a yeoman's job for all of these years that he's been—been taking care of Nora. But there comes a time when an individual does need an elevated standard of care. And the — [GAL] has been with this case since its inception. Just meeting Nora again he certainly noticed the—the, you know, deficiencies, if you will, from the times that he's met her earlier. I believe that—that going to a memory care facility could do nothing really but to benefit her.

Family can still visit. The family can still be a large part of her life. She can still go to church on Sunday. And hopefully the socialization, the integration of other individuals, and the—the therapies, if you will, for lack of a better word, that will come from that memory care facility will also assist Nora in these later years of her life.

So the Court does believe that moving Nora to [the memory care facility] would be a benefit to her and would be in her best interest at this time."

¶ 26    Jim timely appealed the court's decision.

¶ 27                              ANALYSIS

¶ 28    On appeal, Jim claims the court incorrectly applied the "best interests" standard, based on the court's erroneous conclusion that Nora's preferences could not be ascertained. Jim also argues that he was prejudiced by Eugene's characterization of his motion as a "so-called emergency," prompting the court to rush to judgment.

¶ 29                              I. Prejudice

¶ 30    We first consider Jim's claim that Eugene's decision to file the relocation petition as an "emergency" prejudiced the hearing.

¶ 31    Jim claims that Eugene's "manufactured" emergency caused the court to issue its ruling before allowing Magnolia to assess Nora. He notes, correctly, that the GAL requested that the court allow Magnolia to reassess Nora before he made his recommendation. The court agreed, finding it "important" to have Magnolia assess Nora. Jim argues that "[t]he consequence of this rush to judgment was that the Court's ruling was against the manifest weight of the evidence because there was no evidence establishing the elements required by section 11a-14.1 to place Nora in a residential facility."

¶ 32    We acknowledge that the court expedited its consideration of this issue because of the looming deadline to hold Nora's spot at the care facility. But the court did not treat this as an emergency motion, summarily deciding it without notice and hearing. See *Nagel v. Gerald Dennen & Co.*, 272 Ill. App. 3d 516, 519-520 (1995) (emergency motions are those that may be decided *ex parte*, without notice, and without calling the motion to hearing under limited circumstances). There is no real concern about whether Jim received notice of the motion—he

was at the hearing. Nor did the court summarily rule on it. Instead, the court appropriately took its time and held three hearings over the course of about three weeks.

¶ 33    Nor do we find error in the court making its decision without the benefit of the Magnolia assessment. True, the GAL reported that Magnolia was unable to "turn around" an assessment on the court's schedule. But there was another reason why Magnolia said no: concerns stemming from prior payment issues. We need not speculate whether Magnolia would have overlooked this concern if it had more time. While the court could have benefited from the Magnolia report, its absence does not mean that there was insufficient evidence in the record to support the court's decision, including independent testimony from the GAL. As we explain below, Jim's argument about there being "no evidence" is premised on an erroneous interpretation of what had to be shown to move Nora into a residential facility.

¶ 34                                II. Improper Standard

¶ 35    For his argument that the court applied the wrong standard under the statute, Jim focuses on the interplay of two sentences in section 11a-14.1 of the Probate Act. See 755 ILCS 5/11a-14.1 (West 2020). It is the only legal argument he makes on appeal and the only one he pursued in the trial court, so it is the only one we will consider, as it would be unfair to the parties and the trial court to consider arguments in support of reversal that were not advanced at trial or on appeal. *Tuna v. Wisner*, 2023 IL App (1st) 211327, ¶¶ 54-56; see *People ex rel. Department of Human Rights v. Oakridge Healthcare Center, LLC*, 2020 IL 124753, ¶ 36.

¶ 36    To the extent that this argument concerns an interpretation of a statute, it is a question of law we review *de novo. Corbett v. County of Lake*, 2017 IL 121536, ¶ 18. Our primary objective is to give effect to the legislature's intent. *In re R.L.S.*, 218 Ill. 2d 428, 433 (2006). The most

reliable indicator of that intent is the plain and ordinary meaning of the statutory language. *In re Estate of Crawford*, 2019 IL App (1st) 182703, ¶ 29.

¶ 37    As we will explain below, Jim's statutory argument is intertwined with his disagreement with factual findings by the court. We review a court's findings of fact in a guardianship proceeding to determine whether they are against the manifest weight of the evidence. *In re Guardianship of K. R. J.*, 405 Ill. App. 3d 527, 535 (2010). A finding is against the manifest weight when the " 'opposite conclusion is clearly apparent or the fact finder's finding is palpably erroneous and wholly unwarranted, is clearly the result of passion or prejudice, or appears to be arbitrary and unsubstantiated by the evidence.' " *Id*. at 536 (quoting *Joel R. v. Board of Education of Mannheim School District 83*, 292 Ill. App. 3d 607, 613 (1997)).

¶ 38    Section 11a-14.1, which governs the placement of wards in residential facilities, provides in pertinent part:

> "In making residential placement decisions, the guardian shall make decisions in conformity with the preferences of the ward unless the guardian is reasonably certain that the decisions will result in substantial harm to the ward or to the ward's estate. When the preferences of the ward cannot be ascertained or where they will result in substantial harm to the ward or to the ward's estate, the guardian shall make decisions with respect to the ward's placement which are in the best interests of the ward." 755 ILCS 5/11a-14.1 (West 2020).

¶ 39    This language is clear and unambiguous; indeed, the parties do not argue otherwise. The first question is "the preferences of the ward." *Id*. If they can be ascertained, then, as the first sentence above indicates, the guardian shall make decisions "in conformity with" that preference unless that decision would "result in substantial harm to the ward or to the ward's estate." *Id*. If,

on the other hand, "the preferences of the ward cannot be ascertained," then "the guardian shall make decisions" regarding placement in the "best interests of the ward." *Id.*

¶ 40    The trial court, rightly identifying the initial question, immediately set out to determine if Nora's preferences could be ascertained. The court reappointed the GAL to meet with Nora to make that very determination. After doing so, the GAL advised the court that Nora was incapable of expressing her preference. Armed with the finding that Nora's preference could not be ascertained, the trial court agreed that the decision by Eugene, the guardian, to place Nora in a residential facility was in Nora's best interests and thus granted Eugene's motion.

¶ 41    Jim claims, however, that Nora's preference—for staying in her home—*could* be ascertained. Thus, he argues, the court could only overrule her preference if it found that acceding to her wishes would present a substantial risk to Nora or her estate.

¶ 42    For his argument that Nora's wishes could be ascertained, Jim relies on a letter that Nora handwrote eight years earlier and a typed document that she signed, also eight years earlier. The handwritten statement, dated "8/26/13," provides that "At the present time Nora chooses to remain residing at her home *** and she does not want to move into a nursing home or assisted living facility of any kind and she does not want to sell the home. Amen." It was signed as "accepted" by Nora and witnessed by Eugene's wife.

¶ 43    Two weeks later, on "9/8/13," a second, typed statement states in relevant part:

> "It is my desire to remain living in my home for the foreseeable future, at least as long as I can walk, I do not want my home sold and I do not want to move into an assisted living facility or nursing home. I want to stay in my home as long as funds are available and as long as I am able to stay there.

I want to decide for myself when to leave this home or have all 4 children and all 8 grandchildren agree that it is time to move out of my home, before I must move to another location.

There may come a time when I may need to agree to live with one of my children or live in another facility."

This statement was also signed "accepted" by Nora and witnessed, this time by Eugene and his wife.

¶ 44    We would note, initially, that Jim did not bring these documents to the court's attention at any of the three hearings in which he appeared. They are part of the record because this is a probate case, and they were entered into the record when the estate was first created in 2016. But these letters were not shown to the trial court at any time during the controversy before us. More to the point, however, even were we to consider these letters, we would not find error in the trial court's determination.

¶ 45    For one thing, even if we hewed to the literal words in these two documents, the handwritten document only states that Nora did not wish to move into a residential facility "at the present time." Even the typed document expressed a desire to remain in her home "for the foreseeable future, at least as long as I can walk;" she also wrote that "I want to stay in my home as long as funds are available and as long as I am able to stay there." They were not as unqualified as Jim would argue.

¶ 46    But the far more important point is that these documents were eight years old—three years before she was placed under guardianship due to advanced dementia and eight years before the guardian felt compelled to seek placement in a residential facility. Obviously, a lot can happen in someone's life between the ages of 85 and 93 (her age at the time this controversy

arose). We would not discredit these documents altogether, of course. To be sure, they constitute evidence of Nora's preference. But Jim, in his brief, calls them "unrebutted" evidence and asks us to exalt eight-year-old letters over all else.

¶ 47    We do not agree that these documents were unrebutted. The evidence showed that Nora was not receiving care in her home commensurate with what the guardian believed she deserved, and that she was significantly declining as a result. The evidence showed, in other words, that circumstances had changed since 2013, and Nora was unable to tell the court how she felt about placement now, today, in light of those changed circumstances.

¶ 48    Jim is correct that "there is nothing in section 11a-14.1 indicating the passage of time affects the relevancy or materiality of statements reflecting the ward's preferences." But neither does it force the trial court to ignore current realities. To the contrary, section 11a-14.1's reference to the "preferences" (*id*.) of the ward surely means the *current* preferences of the ward; any other reading would be nonsensical.

¶ 49    If we were to accept Jim's interpretation, it would mean that *any* stated preference, regardless of how stale it may be, regardless of any change in circumstances in the interim, could conclusively control whether an adult ward may be placed in a residential facility. But this would unnecessarily limit the authority of a guardian and the court to act in the best interests of the ward. Instead, section 11a-14.1 must mean that the question facing the court is not whether the ward has *ever* expressed a preference, but whether the court can ascertain the ward's *current* preference—that is, her preference at the time the guardian seeks to move her into a residential facility. Previous statements of preference are obviously relevant and should be considered—a statement from two months ago more so than eight years ago; an unqualified statement more so than a qualified one—but they are not always dispositive.

¶ 50   We understand that Jim disagrees with the court's findings that Nora had taken a significant turn for the worse and that her wishes could not be ascertained. But the trial court determined that the guardian had established his case—that Nora's preferences could not be ascertained, and that it was in Nora's best interests to be placed in the residential facility the guardian had identified. We cannot say that either finding by the court was against the manifest weight of the evidence.

¶ 51   The record amply supported the determination that Nora was incapable of expressing her current preference. And while the evidence was contested on Nora's current care and well-being, there was more than sufficient evidence as to best interests. The testimony of the three siblings and the GAL supported the court's finding that Nora was experiencing a sharp decline absent appropriate emotional and intellectual stimulation, and the court correctly noted that moving Nora to a residential facility some fifteen minutes from her home would not prevent her children from visiting and would not prevent Jim from spending Sundays with Nora and taking her to church. At a minimum, we cannot say that the opposite conclusion is clearly evident, or that the trial court's findings were palpably erroneous or wholly unwarranted. See *In re Guardianship of K. R. J.*, 405 Ill. App. 3d at 535-536. We thus uphold the factual findings.

¶ 52   We thus cannot agree with Jim's argument that the court applied the wrong standard. As this is the only legal argument Jim makes, and we find no error, we have no basis to disturb the trial court's judgment.

¶ 53                                    CONCLUSION

¶ 54   The judgment of the circuit court is affirmed.

¶ 55   Affirmed.